## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | Docket No. 1:18-cv-68-NT |
| v. | ) ) | |
| CALPERS CORPORATE PARTNERS, LLC, *et al.*, | ) ) ) | |
| Defendants. | ) | |

## ORDER ON PLAINTIFF'S MOTION TO AMEND AND PARTIES' MOTIONS TO EXCLUDE EXPERT TESTIMONY

In this case, the Plaintiff Official Committee of Unsecured Creditors ("**Plaintiff**" or "**Committee**") seeks to avoid and recover certain transfers made by Lincoln Paper and Tissue LLC ("**Debtor**") to CalPERS Corporate Partners LLC ("**Defendant**" or "**CalPERS**").[1] The Plaintiff alleges that the transfers were constructively fraudulent under federal bankruptcy law and the Maine Uniform Fraudulent Transfer Act ("**MUFTA**"). Before me are three pending motions: the Plaintiff's Motion for Leave to File a Second Amended Complaint (ECF No. 172); the Plaintiff's Motion to Exclude the Expert Testimony of Edward M. McDonough (ECF No. 177); and the Defendant's Motion to Exclude the Expert Report and Testimony of Craig T. Elson (ECF No. 178). For the reasons set forth below, the Plaintiff's motion

---

[1] The Plaintiff originally brought its claims against several other defendants but has since dismissed those claims, either through a stipulation of dismissal or through the filing of its First Amended Complaint. *See* ECF Nos. 8, 42, 145.

to amend is **GRANTED in part** and **DENIED in part**; the Plaintiff's motion to exclude is **DENIED**; and the Defendant's motion to exclude is **DENIED**.

## BACKGROUND

Lincoln Paper and Tissue, LLC (the "**Debtor**") operated a pulp, paper, and tissue mill (the "**Mill**") in Lincoln, Maine. First Am. Compl. ¶ 15 (ECF No. 42). Until November of 2013, the Debtor produced all of the pulp used in the production of its paper and tissue products. First Am. Compl. ¶ 16. In conjunction with the pulp production, the Debtor utilized a recovery boiler, which also produced steam used for power generation at the Mill. First Am. Compl. ¶¶ 18–19. On November 2, 2013, an explosion at the Mill caused significant damage to the boiler. First Am. Compl. ¶ 21. The shutdown of the boiler forced the Debtor to purchase pulp on the open market and purchase additional electricity to keep the Mill in operation. First Am. Compl. ¶¶ 22–23. The Debtor's Board of Directors ("**Debtor's Board**") accepted a cash settlement with the Debtor's insurance company on December 10, 2013. First Am. Compl. ¶¶ 36–37.

Over the next six months, the Debtor's Board authorized two distributions (collectively, the "**Distributions**") to LPT Holding, the sole member of the Debtor.[2] First, on December 17, 2013, the Debtor's Board authorized a distribution of $3 million to LPT Holding, which thereafter made payments to its members, including CalPERS (the "**December 2013 Distribution**"). First Am. Compl. ¶ 38. Then, on

---

[2]    CalPERS had a membership interest in LPT Holding and had the right to designate two persons to the Boards of both the Debtor and LPT Holding. First Am. Compl. ¶¶ 11–12.

May 16, 2014, the Debtor's Board authorized the Debtor to distribute an additional $4 million to LPT Holding, which again made payments to its members, including CalPERS ("**May 2014 Distribution**"). First Am. Compl. ¶¶ 46–47. The Plaintiff alleges that the Debtor's Board knew or should have known that accepting the insurance settlement and subsequently distributing those proceeds would impair the financial health of the Debtor. First Am. Compl. ¶¶ 41, 50. The Plaintiff further alleges that the Debtor was insolvent at the time of, or shortly after, the Distributions. First Am. Compl. ¶ 51.

In July of 2015, CalPERS and Douglas Meltzer, whom CalPERS had appointed to the Debtor's Board, entered into a General Release (the "**Release**") with the Debtor, LPT Holding, and other individuals, in which the Debtor agreed to release its claims against CalPERS and Meltzer. First Am. Compl. ¶ 56.

On September 28, 2015, the Debtor filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code in the U.S. Bankruptcy Court in this District. After the Committee was appointed by the bankruptcy trustee to act on its behalf, the Committee subsequently filed this Adversary Proceeding, and I later withdrew the reference from the Bankruptcy Court. (ECF No. 1.)

In an eleven-count Complaint, the Plaintiff seeks to avoid and recover the Distributions and void the Release pursuant to federal and state law, contending that they were fraudulent transfers.

## DISCUSSION

Three motions are pending before me: (1) the Plaintiff's second motion for leave to file an Amended Complaint; (2) the Plaintiff's motion to exclude the testimony of the Defendant's Expert, Edward M. McDonough; and (3) the Defendant's motion to exclude the Plaintiff's expert, Craig T. Elson. I address each motion in turn.

## I.   Motion to Amend the Complaint

The Plaintiff has moved to file a Second Amended Complaint. Pl.'s Mot. for Leave to File Second Amended Compl. ("**Pl.'s Mot. Amend**"). Specifically, the Plaintiff seeks to make the following changes:

- Remove Defendant Stanley Okoro from the case caption, eliminate references to him in parts of the Complaint, and revise the total amount of the Distributions to the Defendants because he is no longer included with the Defendants. This change reflects the fact that the Plaintiff has settled with Okoro and he has been dismissed from the case. The Defendant does not oppose this change.

- Correct an internal cross reference in ¶ 60. The Defendant does not oppose this change.

- Correct allegations in ¶¶ 76 and 85 to track the language in 14 M.R.S.A. § 3575(1)(B)(2), rather than 14 M.R.S.A. § 3575(1)(B)(1). The Defendant does not oppose this change.

- Update contact information for the Plaintiff's counsel. The Defendant does not oppose this change.

- Add Count XII "to correct an oversight in the First Amended Complaint regarding the [Plaintiff's] claims under [MUFTA]." Noting that the First Amended Complaint contains a claim under the Bankruptcy Code alleging that the Debtor was insolvent at the time of the Distributions or became insolvent as a result of the Distributions, the Plaintiff states that it "inadvertently failed to add a mirror claim based on insolvency under [MUFTA]." As a result, the "new Count XII corrects this oversight by merely restating allegations already

4

included elsewhere in the First Amended Complaint."[3] The Defendant opposes this change.

## A.   Legal Standard

"A motion to amend a complaint will be treated differently depending on its timing and the context in which it is filed." *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 11–12 (1st Cir. 2004). Federal Rule of Civil Procedure 15(a) permits a plaintiff to amend a complaint once as a matter of right before the defendant files a responsive pleading. *Id.* After that, a party "may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Generally, a court "should freely give leave when justice so requires." *Id.* However, when "a litigant seeks leave to amend after the expiration of a deadline set in a scheduling order, . . . Rule 16(b)'s more stringent good cause standard supplants Rule 15(a)'s leave freely given standard." *O'Brien v. Town of Bellingham*, 943 F.3d 514, 527 (1st Cir. 2019) (internal quotations omitted); *see also* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."). Nevertheless, a district court retains "great latitude" in deciding whether to permit the filing of an amended complaint. *O'Brien*, 943 F.3d at 527 (quoting *Jones v. Winnepesaukee Realty*, 990 F.2d 1, 5 (1st Cir. 1993)).

The good cause standard "focuses on both the conduct of the moving party and the prejudice, if any, to the nonmovant." *Miceli v. JetBlue Airways Corp.*, 914 F.3d

---

[3]   The Plaintiff seeks to add eight paragraphs as part of this new claim. Other than a reference to MUFTA, the Plaintiff asserts that the allegations contained in these new paragraphs are identical to allegations already set forth in the First Amended Complaint. Moreover, the Plaintiff states that the prayer for relief pursuant to this new count is identical to the prayers for relief in Counts I and III. Pl.'s Mot. Amend 3–4 (ECF No. 172).

73, 86 (1st Cir. 2019). However, "the moving party's diligence or lack of diligence serves as the 'dominant criterion.'" *Id.*; *see also Steir*, 383 F.3d at 12 (explaining that the "good cause" standard "focuses on the diligence (or lack thereof) of the moving party more than it does on any prejudice to the party-opponent"). "[T]he longer a plaintiff delays, the more likely the motion to amend will be denied, as protracted delay, with its attendant burdens on the opponent and the court, is itself a sufficient reason for the court to withhold permission to amend." *Steir*, 383 F.3d at 12 (adding that motions that require the "re-opening of discovery with additional costs, a significant postponement of the trial, and a likely major alteration in trial tactics and strategy" are "[p]articularly disfavored") (internal quotations omitted). And a court should not "be expected to look kindly upon a plaintiff who seeks belatedly to amend her complaint based on information that she had or should have had from the outset of the case." *Miceli*, 914 F.3d at 86 (internal quotations omitted).

## B.   Analysis of the Plaintiff's Motion

In this case, I entered a Scheduling Order on April 12, 2018, setting the deadline for amending the Complaint as May 31, 2018. *See* Am. Scheduling Order 4 (ECF No. 15). I previously granted the Plaintiff's late—albeit barely—first motion to amend its Complaint. Order on Pl.'s Mot. for Leave to File Am. Compl. (ECF No. 41). Now, nearly two years after the deadline, the Plaintiff seeks to amend again. The Defendant has consented to all proposed changes except the addition of the MUFTA insolvency claim. *See* Def.'s Opp'n Pl.'s Mot. Amend ("**Def.'s Opp'n Amend**") (ECF No. 179). As such, I grant all unopposed changes, and I must now determine whether

6

the Plaintiff has shown good cause to add the new claim outside of the timetable set by the Scheduling Order.

As noted, in the First Amended Complaint, the Plaintiff included a claim under 11 U.S.C. § 548(a)(1)(B)(ii)(I), alleging that the Debtor was insolvent on the date that the Distributions were made or became insolvent as a result of the Distributions. First Amended Compl. ¶¶ 90–97. In the Second Amended Complaint, the Plaintiff seeks to add a similar claim under MUFTA, 14 M.R.S.A. §§ 3576(1) and 3578.

I begin with a look at the language of the two statutes. The federal statute states,

> The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily . . .
>
>> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>>
>> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

11 U.S.C. § 548(a)(1). MUFTA, in turn, states,

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

14 M.R.S.A. § 3576(1).

The Plaintiff asserts that this additional MUFTA claim simply mirrors the federal claim and thus imposes no prejudice on the Defendant. The Defendant disputes this characterization of the similarities between the two claims, noting that only MUFTA requires the Plaintiff to "prove that the creditors' claim arose *prior to the transfer at issue*." Def.'s Opp'n Amend ¶ 14. According to the Defendant, permitting the addition of the MUFTA claim would prejudice the Defendant because the parties "did not, and had no reason to, take *any* discovery on the issue of when creditors' claims actually accrued."[4] Def.'s Opp'n Amend ¶ 15 (emphasis in original). In response, the Plaintiff maintains that no additional discovery is needed because the First Amended Complaint already alleged that there were creditor claims that arose before the Distributions were made. Pl.'s Reply Amend 3–4 (ECF No. 180).

As noted above, the moving party's diligence is the primary issue in a motion to amend a complaint after the expiration of the scheduling deadline. In this case, the Plaintiff offers little evidence that it was diligent. This case is more than two years old, and the Plaintiff has already amended the Complaint once. The Plaintiff points to no justification for its failure to add this claim earlier. For example, there is no suggestion that the Plaintiff was unaware of the availability of this claim when it filed its original or amended Complaint. Nor is there any assertion that the

---

[4]     The Defendant acknowledges that the other counts under MUFTA also have a creditor requirement, but it points out that those claims, which arise under 14 M.R.S.A. § 3575(1), allow for recovery "whether the creditor's claim arose _**or**_ after the transfer was made." Def.'s Opp'n Amend ¶ 16 (quoting 14 M.R.S.A. § 3575(1)). Because "it is undisputed that there were creditors' claims *after* the transfers were made" and "the timing of the accrual of claims was irrelevant under the [First Amended Complaint's] claims, [the parties] did not need to take discovery as to when any of the creditors' claims actually arose." Def.'s Opp'n Mot. Amend ¶ 16.

8

Defendant's conduct contributed to the Plaintiff's delay in adding the claim. *See Steir*, 383 F.3d at 13–14 (noting that plaintiff claimed that defendant's evasive responses during discovery obscured the availability of the claim and reasoning that it would have been "well within the discretion of the district court to allow the motion" to amend," but concluding that it was also "not an abuse of discretion to deny it"); M*cGowen v. Four Directions Develop. Corp.*, No. 1:12-cv-00109-JAW, 2013 WL 2455977, at *4–5 (D. Me. June 6, 2013) (plaintiff attempted to amend after new evidence was produced belatedly by defendant during discovery). Rather, the Plaintiff simply states that it "inadvertently" failed to add the MUFTA claim. Pl.'s Mot. Amend 3.

As the Plaintiff points out, courts in this District have granted motions to amend even where the movant makes a "marginal showing of good cause for her delay" when "other considerations favor relaxing the Rule 16(b) standard." *See McGowen*, 2013 WL 2455977, at *5; *see also Pedersen v. Fairpoint Comm'cns, Inc.*, No. 2:17-cv-00389-GZS, 2018 WL 1244148, at *6 (D. Me. Mar. 9, 2018). In granting the plaintiff's motion to amend in *McGowen*, for example, the Court noted that the plaintiff's "proposed amendments merely refine and add detail to allegations already before the Court," "do[ ] not propose any new legal theories," and "are generally consistent with the factual allegations in the original Complaint." *McGowen*, 2013 WL 2455977, at *5 (distinguishing these changes from proposed amendments in other cases that sought to introduce new legal theories, changed the entire focus of the case,

and named new defendants). The Plaintiff seeks a similar ruling here, arguing that there would be no prejudice to the Defendant in adding the claim.[5]

The deadline for amendment in the Scheduling Order expired nearly two years ago, and the only reason the Plaintiff gives for this "protracted delay" is "inadvertence." *See Steir*, 383 F.3d at 12. This does not amount to a showing of "good cause"—not even a marginal one.[6] *See id.* (affirming denial of motion to amend where plaintiff blamed failure to meet scheduling order deadline on lack of communication between attorneys); *see also Somascan, Inc. v. Philips Med. Sys. Nederland, B.V.*, 714 F.3d 62, 64 (1st Cir. 2013) (affirming district court's denial of motion to amend where "[n]o new evidence was alleged to have been uncovered and no excuse was offered"). As the First Circuit has explained, for "Rule 16(b) to operate effectively, litigants cannot be permitted to treat a scheduling order as a frivolous piece of paper idly entered, which can be cavalierly disregarded without peril." *O'Connell v. Hyatt Hotels of P.R.*, 357 F.3d 152, 155 (1st Cir. 2004) (internal quotations omitted). As such, I deny the Plaintiff's motion to amend to the extent it seeks to add a new count.

---

[5]    The Defendant claims it would be prejudiced, asserting that unspecified additional discovery would be required on when creditors' claims arose because adding the new MUFTA count—which only applies to creditors' claims that arose before the transfers—would make the timing of the creditors' claims relevant. *See* Def.'s Opp'n Amend ¶¶ 14–16. Because I ultimately conclude that the Plaintiff has not met the "good cause" showing required to amend at this late stage, I sidestep the issue of prejudice.

[6]    The circumstances in this case are also distinguishable from cases where courts have permitted amendment upon a marginal showing of good cause. In *Pedersen*, for example, the court explained that the plaintiff filed her motion less than a month after the expiration of the deadline to amend the pleadings and "well before the close of discovery" and that the parties had not yet sought any extensions of the court's scheduling order deadlines. *Pedersen v. Fairpoint Comm'cns, Inc.*, No. 2:17-cv-00389-GZS, 2018 WL 1244148, at *6 (D. Me. Mar. 9, 2018). Those circumstances are not present here. *See Hearts With Haiti, Inc. v. Kendrick*, 2:13-cv-39-JAW, 2014 WL 12650625, at *2 (D. Me. May 30, 2014) (denying motion to amend where "discovery [was] closed and the court [had] held the pre-filing conference that is required by Local Rule 56(h)").

## II.   Motions to Exclude Expert Testimony

Both the Plaintiff and the Defendant seek to exclude testimony from the other party's expert. Specifically, the Plaintiff has moved to exclude the testimony of Edward M. McDonough, whose report concludes that the Debtor was solvent based on several different tests. Expert Report of Edward M. McDonough 58 ("**McDonough Report**") (ECF No. 177-1). The Defendant seeks to exclude the testimony and report of Craig T. Elson, who concluded that the Debtor was insolvent and had unreasonably small capital at the time of the distributions. Expert Report of Craig T. Elson 5 ("**Elson Report**") (ECF No. 178-2).

### A.   Legal Standard

District courts act "as gatekeepers of expert testimony." *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Securities (USA) LLC*, 752 F.3d 82, 91 (1st Cir. 2014). "A district court must 'ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' " *Packgen v. Berry Plastics Corp.*, 847 F.3d 80, 85 (1st Cir. 2017) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)). The testimony is considered reliable if it is "based on sufficient facts or data," it "is the product of reliable principles and methods," and the "expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)–(d). However, the proponent of the testimony does not "carry the burden of proving to the judge that the expert's assessment of the situation is correct." *United States v. Mooney*, 315 F.3d 54, 63 (1st Cir. 2002) (internal citations and quotations omitted). Rather, the proponent must only "show that the expert's conclusion has been arrived at in a scientifically sound and methodologically

reliable fashion." *Id.* (internal citations and quotations omitted). " '[E]xpert testimony may be more inferential than that of fact witnesses,' but 'an expert opinion must be more than a conclusory assertion about ultimate legal issues' " to be admissible. *RTR Techs., Inc. v. Helming*, 707 F.3d 84, 93 (1st Cir. 2013) (quoting *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993)).

Expert testimony must also be relevant "not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Bricklayers*, 752 F.3d at 91 (internal quotations omitted); *see also* Fed. R. Evid. 702(a). A court must examine the expert's conclusions "to determine whether they flow rationally from the methodology employed," and must exclude testimony where " 'there is simply too great an analytical gap between the data and the opinion proffered.' " *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 32 (1st Cir. 2012) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Determining whether an expert's testimony is "based on sufficient facts or data," "calls for a quantitative rather than qualitative analysis." Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendment. In other words, in performing its *Daubert* gatekeeping function, a district court need not assess whether the facts are accurate. Rather, "the focus is on 'whether the witness obtained the amount of data that the methodology itself demands.' " *In re Blair*, 588 B.R. 605, 615–16 (D. Colo. Bktcy. 2018) (quoting *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1223 (D. Colo. 2008)); *see also* Wright & Miller, 29 Fed. Prac. & Proc. Evid. § 6268 (2d ed.)

("[S]ufficiency is a function of the nature and scope of the opinion offered, the quantity of data both available and pertinent to the issue at hand, and what is deemed sufficient by experts in the pertinent field when working outside the courtroom."). In cases where courts have excluded testimony because the expert relied on too little data, it was clear that the lack of data undermined or distorted the methodology itself. *See In re Blair*, 588 B.R. at 617–18 (excluding expert testimony as unreliable where expert used an altered methodology because, as he acknowledged, he did not have sufficient data to use the established methodology); *Stollings v. Ryobi Technologies, Inc.*, 725 F.3d 753, 766 (7th Cir. 2013) (giving example that, "if an expert seeks to testify about an average gross sales price but is going to base the testimony on sales to only a single customer, a court would appropriately exclude the testimony because a single observation does not provide a sufficient basis for calculating an average"). Nevertheless, a district court should also consider "whether the expert ignored a significant portion of seemingly important data." Wright & Miller, 29 Fed. Prac. & Proc. Evid. § 6268 (2d ed.) ("If an expert 'cherry picks' favorable data in this manner but ignores a significant quantity of other important facts, the trial court would be justified in concluding that the expert's testimony is not based on sufficient facts or data.").

## B.   Plaintiff's Motion to Exclude

In his report, Defendant's expert McDonough analyzed the Debtor's solvency at the time of the Distributions by applying three different tests: the Payment of Debts Test; the Balance Sheet Test; and the Capital Adequacy Test. McDonough

Report 31. McDonough ultimately concluded that the Debtor was solvent according to each test. McDonough Report 58.

In arguing that McDonough should be precluded from testifying, the Plaintiff asserts that McDonough (1) "utilized an inapplicable test for solvency under the Bankruptcy Code and [MUFTA]," (2) "blindly relied on management's projections in the face of substantial contradictory information and in contravention of his own writings," and (3) "disregarded voluminous and persuasive facts and data that undermined the conclusions that he seemed determined to reach." Pl.'s Mot. Exclude 1–2. For these reasons, the Plaintiff argues that McDonough's testimony would be both unreliable and unhelpful. *Id.*

### 1.   Applicable Test for Solvency under Payment of Debts Test

The Plaintiff first argues that McDonough's testimony on the Payment of Debts test should be excluded because he cited and relied on an incorrect standard, making his testimony both unreliable and unhelpful. As the Plaintiff notes, McDonough begins his analysis by citing the insolvency presumption contained in 14 M.R.S.A. § 3573(2), which states that a "debtor who is generally not paying his debts as they become due is presumed to be insolvent." 14 M.R.S.A. § 3573(2). However, the First Amended Complaint asserts that the Distributions should be avoided, not pursuant § 3573(2), but pursuant to 14 M.R.S.A. § 3575(1)(B) (the debtor "[i]ntended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as the debts became due") and 11 U.S.C. § 548(a)(1)(B)(ii)(III) (the debtor "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured"). The Plaintiff adds that,

14

although the insolvency presumption under § 3573(2) is worded similarly to the other applicable tests, "the analysis is temporally quite distinct." Pl.'s Mot. Exclude 14. The insolvency presumption focuses on the Debtor's payment of debts at the time of the Distributions, whereas the tests under 14 M.R.S.A. § 3575(1)(B) and 11 U.S.C. § 548(a)(1)(B)(ii)(III) are "forward-looking, focusing on the ability to pay debts incurred, and coming due, in the future." Pl.'s Mot. Exclude 14.[7]

The Defendant acknowledges that McDonough "mistakenly reference[d]" the wrong provision in his report but emphasizes that McDonough cited the correct statute at the beginning of his analysis on solvency and performed his analysis under the correct standard. Def.'s Opp'n Exclude 14 (ECF No. 182). The Defendant explains that McDonough "performed a forward looking analysis of the Debtor's projected cash flows." Def.'s Opp'n Exclude 14–15.

Although McDonough quoted an incorrect section of MUFTA and analyzed historical trends to determine if the Debtor was paying its debts as they became due during the year prior to each Distribution, his actual analysis—and the conclusions drawn from it—relied on additional data and incorporated standards from the correct test. McDonough Report 47–49. He analyzed the Debtor's ratio of assets to liabilities from November of 2013 through June of 2014, concluding that they were above the industry average during that time. McDonough Report 49–50. He also analyzed the

---

[7]     The Plaintiff also asserts that McDonough's ultimate solvency conclusion "is based on faulty logic" because he "appears to assume that rebutting the presumption is a basis for establishing the Debtor's solvency." Pl.'s Mot. Exclude 14. As the Plaintiff points out, rebutting a presumption merely means that the Plaintiff would need to prove the Debtor's insolvency by others means. Pl.'s Mot. Exclude 14.

Debtor's accounts payable turnover ratio and the average number of days the Debtor had payables outstanding for the same period, finding that the Debtor paid its debts within 25 days, about half the industry average. McDonough Report 50. Moreover, although McDonough's "Analysis of Projected Cash Flow" within the Payment of Debts section is brief, it references other parts of his report that contain more robust analysis. Specifically, McDonough examined the Debtor's projected cash flow under three variable scenarios as part of his Capital Adequacy Test analysis.[8] McDonough Report 45–46. Based on those scenarios, McDonough concluded that the Debtor "had sufficient cash to pay its debts as they came due." McDonough Report 50. Finally, McDonough reviewed the deposition testimony of Debtor board members and officers, all of whom maintained that they believed that the Debtor would still be able to pay its debts as they became due after the Distributions.

The Plaintiff has not established that McDonough's use of the Payment of Debts test is unhelpful or unreliable. The Plaintiff's critiques of McDonough's performance of the analysis are more suited to cross-examination than exclusion.

### 2.    Asset Approach to Balance Sheet Test

Next, the Plaintiff criticizes McDonough's testimony on the Asset Approach to the Balance Sheet Test, as both unhelpful and unreliable. The Plaintiff claims that McDonough's use of replacement value discounted by liquidation principles will not assist the trier of fact to determine the fair value of the assets as required by statute.

---

[8]    Specifically, the Defendant states that McDonough's analysis "included a base case, a downside case (10% reduction in EBITDA), and a stress case (which was an extreme stress test using a 50% reduction in EBITDA)." Def.'s Opp'n Exclude 15 (ECF No. 182) (citing Expert Report of Edward M. McDonough 46 ("**McDonough Report**") (ECF No. 177-1)).

That problem is compounded, according to the Plaintiff, because McDonough did not apply liquidation principles to the liability side of the balance sheet, which did not take into account contingent liabilities. Pl.'s Mot. Exclude 15–16.

The Plaintiff's argument that McDonough's Asset Approach analysis is unreliable runs in a similar vein. The Plaintiff asserts that McDonough provides no explanation for the reasoning behind his 15 percent discount to Accounts Receivable ("**AR**") and 50 percent discount to inventory. Pl.'s Mot. Exclude 16. In addition, the Plaintiff argues that McDonough considered no data about the Debtor's liabilities beyond the book values stated in the balance sheets, completely ignored any analysis of the Debtor's true liabilities, and failed to explain why this approach was proper. Pl.'s Mot. Exclude 16. These shortcomings, the Plaintiff asserts, create " 'too great an analytical gap between the data and the opinion proffered.' " Pl.'s Mot. Exclude 16 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

The Defendant counters that the Plaintiff misunderstands McDonough's Asset Approach analysis. Def.'s Opp'n Exclude 11. The Defendant explains that McDonough did not use a "liquidation premise of value," but rather "utiliz[ed] standard and generally-accepted valuation principles and methods to calculate the fair value of the Debtor's assets and liabilities on a going-concern basis." Def.'s Opp'n Exclude 12. Citing the American Institute of Certified Public Accountants, the Defendant explains that the "very definition of [fair market value] encompasses the cost of selling (or replacing) an asset." Def.'s Opp'n Exclude 12–13. As such, it was

"appropriate for McDonough to use the replacement value in his Asset Approach analysis." Def.'s Opp'n Exclude 13.

Moreover, the Defendant rejects the Plaintiff's argument that McDonough failed to analyze the Debtor's "then-known and knowable liabilities." Def.'s Opp'n Exclude 13. The Defendant explains that McDonough "followed standard valuation procedures," by evaluating the Debtor's balance sheets, which "already took into account any contingent liabilities that were then known or knowable," and by declining to "assign value to the Debtor's speculative contingent liabilities." Def.'s Opp'n Exclude 13–14.

Beginning with the Plaintiff's arguments about McDonough's use of liquidation value rather than fair market value, McDonough describes the Asset Approach generally as the "cost to replace the assets of a company." McDonough Report 33. And he also explains that the Asset Approach "focuses on a company's net value, or the value of its total assets minus its total liabilities."[9] McDonough Report 33. Moreover, in his actual analysis of the Debtor's assets, McDonough explains that he was calculating the "fair market value" of the Debtor's property, plant, and equipment. McDonough Report 39.

---

[9]     McDonough does describe the Asset Approach as "a going concern value." McDonough Report 33. McDonough explains that, in a solvency analysis, the "premise of value is predicated on the Highest and Best use of the company's assets." McDonough Report 31–32. After analyzing the state of the Debtor's revenue and long-term debt, McDonough concludes that the "Highest and Best Use of [the Debtor's] assets was clearly as a going concern," and thus he analyzes the premise value for the Debtor at the time of the Distributions "as a going concern." McDonough Report 31–32. These conclusions seem neither unreliable nor unhelpful, and the Plaintiff will be free to question McDonough on them during any cross-examination.

In his deposition, McDonough emphasizes that he "did not do a liquidation value in the sense of just selling the assets off and getting what you can." McDonough Depo. Tr. 205:18–20; *see also* McDonough Depo. Tr. 138:18–20 ("Q Did you perform a liquidation analysis as one of your valuation approaches? A No."). Rather, he "used an asset approach, which looked at the value of the assets and what you might have to pay to replace them based upon appraisal information, but that's kind of a replacement cost."[10] McDonough Depo. Tr. 205:20–23. Thus, despite the Plaintiff's insistence otherwise, it appears that McDonough did not value the Debtor under a liquidation premise of value.

Turning to the Plaintiff's assertions regarding McDonough's consideration of the Debtor's liabilities, it is clear from his report that McDonough evaluated both current and non-current liabilities as part of his Asset Approach. McDonough Report Ex. D2. McDonough also notes that liabilities are contained within the balance sheets on which he relies—at least to the extent that they are likely to be incurred and the amount of loss can be reasonably estimated. *See* McDonough Report 11 (explaining that contingent liabilities will only be recorded on the balance sheet if certain conditions are met); McDonough Report 12 (noting that a liability to FERC was included on the balance sheet).

---

[10] Later, McDonough explains that he based the value of the Debtor's property, plant, and equipment on "orderly liquidation of 12 or 18 months," adding that "you're just not fire saling." McDonough Depo. Tr. 208:25–209:05. But McDonough distinguishes between "forced liquidation" and "orderly liquidation" value. The latter, which he explains he used to value the Debtor's property, plant, and equipment, was "the value of the assets as they sat there," as "you would sell them without any compulsion to have to sell them." McDonough Depo. Tr. 140:03–23.

In response to why he chose to use a 15 percent discount to AR and the 50 percent discount to the book value of inventory, McDonough stated at his deposition that he based the numbers on work he had previously done and on discussions with companies about getting rid of receivables. McDonough Depo. Tr. 214:10–18. According to those discussions, the discount rate for AR varies—"depending on the quality"—between 5 percent and 35 percent, so McDonough chose "something that [he thought] is kind of in the middle." McDonough Depo. Tr. 214:15–18. And, likewise, his experience working in bankruptcies led to his selection of the 50 percent discount for inventory, which he justified by explaining that someone would pay less for inventory that has already been handled. McDonough Depo. Tr. 215:06–14. The Plaintiff simply asserts that "there is no explanation about the basis of the 15% discount to AR," and argues that this discount is "based on assumed liquidation by factoring." Pl.'s Mot. Exclude 16; Pl.'s Reply Mot. Exclude 8 (ECF No. 187). In addition to failing to show that McDonough's calculation was based on liquidation, the Plaintiff offers no reason why McDonough's discount rates are unreliable or how they undermine the foundation of McDonough's conclusions.

While the Plaintiff clearly disagrees with the methods used by McDonough to reach his conclusions, it has not shown that they are unreliable or unhelpful. The Plaintiff's counsel will be free to inquire on cross examination as to whether the methods used to assess the Debtor's property resulted in a fair value or whether the Debtor's contingent liabilities were erroneously omitted.

### 3. Capital Adequacy Test and Income Approach to Balance Sheet Test

Finally, the Plaintiff argues that McDonough's testimony about the Capital Adequacy Test and the Income Approach to the Balance Sheet Test should be excluded as unreliable because McDonough "blindly accept[ed] mere summaries of management-prepared, EBITDA-level projections."[11] Pl.'s Mot. Exclude 17. The Plaintiff adds that McDonough "failed to review or analyze the reasonableness of those projections by critically examining any of the underlying facts or data, or any conflicting information, including other contemporaneously prepared projections forecasting significant negative EBITDA."[12] Pl.'s Mot. Exclude 17. As such, the Plaintiff asserts that McDonough did not rely on sufficient facts and data and thus his conclusions are unreliable.

In response, the Defendant emphasizes that the Plaintiff is not objecting to the reliability of the Income Approach methodology, but rather how McDonough applied

---

[11] The Plaintiff cites to a portion of McDonough's deposition in which he acknowledges that various numbers were not listed in the projections. *See* McDonough Depo. Tr. 61:19–62:12. The Plaintiff adds that, had McDonough reviewed "whether the Debtor's past financial performance was consistent with prior management projections," including for 2011 and 2012, he "would have discovered that the Debtor's prior performance was uniformly more negative than prior projections." Pl.'s Mot. Exclude 18-19.

[12] The Plaintiff argues that, in relying solely on the management projections, McDonough ignored the fact that the Debtor's "largest pre-Explosion customer . . . was lost to a competitor." Pl.'s Mot. Exclude 18. In addition, the Plaintiff criticizes McDonough for failing to consider conflicting information, including a 2013 budget forecast that predicted "a much more dire result" for the 2014 EBITDA and a February 2013 report prepared by the Debtor's own consultants that advised that "converting the mill to a tissue-only operation would result in substantially negative EBITDA and likely would not be viable." Pl.'s Mot. Exclude 18.

Finally, the Plaintiff asserts that McDonough improperly relied on management's Cost Increase Projection in concluding that the Debtor would incur only a $15 per ton cost increase in switching to a tissue-only mill. Pl's Mot. Exclude 19. According to the Plaintiff, McDonough had other data available and failed to review it, unlike the Plaintiff's own expert, who concluded that the cost increase would likely be $200 per ton. Pl.'s Mot. Exclude 19.

that methodology. Def.'s Opp'n Exclude 3. In addition, the Defendant asserts that McDonough's reliance on management projections was acceptable under professional standards and First Circuit case law, that McDonough did in fact rely on more than just the projections in his analysis,[13] and that he did assess the projections for reasonableness[14] but "simply did not second guess them by impermissibly using hindsight." Def.'s Opp'n Exclude 3–4.

The Defendant emphasizes that McDonough compared the projections with the Debtor's actual performance for the first four months of 2014 and with historical data. Def.'s Opp'n Exclude 8. The minimal deviation from the projections "gave [him] some comfort that . . . there was some reliability" in their projection process. Def.'s Opp'n Exclude 8–9; McDonough Depo. Tr. 70:20–72:20. Aside from impermissible hindsight testimony, the Defendant contends that there "is no evidence in the record that management's bookkeeping process was unreasonable." Def.'s Opp'n Exclude 9.

---

[13]    Specifically, the Defendant asserts that McDonough relied on the Debtor's 2013 financial statements, credit memos prepared by two different third-party lenders, and transcripts of the depositions of the Debtor's board and management and other third parties. Def.'s Opp'n Exclude 5. The Defendant adds that the one-page document was a "summary of complex calculations created and reviewed by management" and was just part of a "package of materials provided to the Debtor's board in advance of each board meeting." Def.'s Opp'n Exclude 6. That package reportedly "included an overview of the business environment, strategic issues, facility and other changes to transition to a nonintegrated tissue mill, tax implications, and analysis of costs including post-event operations, and tissue product cost comparison with and without improving operating results." Def.'s Opp'n Exclude 6. The Defendant maintains that "McDonough analyzed all of this information in conducting his analysis." Def.'s Opp'n Exclude 6.

[14]    The Defendant explains that, "[b]ased on his review of documents and managements' deposition testimony, as well as interviews with Mr. Herring, McDonough knew that the projections were based on significant input from management, discussions with customers, and industry trends." Def.'s Opp'n Exclude 7–8. McDonough relied on the industry experience of the Debtor's management and board because they "lived and breathed the business on a daily basis" and really understood the business. Def.'s Opp'n Exclude 8 (citing McDonough Depo. Tr. 66:8–14).

In this case, the Plaintiff's issue with McDonough's analysis is that he failed to review the data underlying management's projections and ignored conflicting information. But McDonough's decision to rely on the projections from the Debtor's management, rather than weed through the underlying data itself, does not alter the methodology he used. *See Am. Aerial Servs., Inc. v. Terex USA, LLC*, No. 2:12-cv-00361-JDL, 2015 WL 1947265, at *4 (D. Me. Apr. 29, 2015) (expert may rely on financial data supplied by party to conduct financial analysis without having independently verified the data.).

The Plaintiff also argues that, if McDonough had reviewed the "underlying facts, data, and assumptions" for management's projections, he would have called the reasonableness of those projections into question. Pl.'s Reply Mot. Exclude 5–6. However, this argument ignores McDonough's claim that he did question and analyze the reasonableness of the projections. At his deposition, McDonough responded to a question about what he did to assess that reasonableness as follows.

> When I looked at the minutes, I did a couple things. One, I looked at the deposition testimony of Mr. Van Scotter, as well as Mr. Wissmann and the other board members, and they all basically were saying something to the effect of, you know, when we received projections, they included everything that was known at that time, okay? That it was a robust projection process where they talked to sales people, they talked to the operating people, et cetera. So the projections were built from the ground up. It wasn't somebody sitting in the office just making up numbers. . . . So it appears to me that they had a fairly robust projection process. You also have to understand these people lived and breathed the business on a daily basis. This is not like Mr. Elson or myself coming and developing projections for a company. They understood this business. They develop projections every year, budgets every year, reviewed financials. So they had a very strong understanding of their business. That's the first point. Secondly, like I said, as I looked at the profit improvements on Page 7 of my report, Mr. Mishkin from Sanabe noted that his company was

23

involved in looking at flyspecking, if you would, the projected profit improvements, and he said we thought it was reasonable. So you also had some outside -- somebody outside of the company who has, in Mr. Mishkin's deposition, reading that, he has been in the paper business a long time, he has industry expertise. He said he looked at it and said it was reasonable. So I'm looking at those individuals and what they're saying. At the same time, the $5 million in EBITDA isn't something that they haven't obtained in the past. Okay? So if you look at -- historically, they've hit $5 million of EBITDA or more as a combined company, okay? So it's not like they're boldly going where no man has gone before. So it's a combination of all those issues that leads me to say that they're reasonable. And again, these are projections put together by management, contemporaneously at that time, that's very involved in the business.

McDonough Depo. Tr. 65:15–67:12. This explanation demonstrates that McDonough applied his own expertise in assessing the reasonableness of the projections. *See Am. Aerial Servs.*, 2015 WL 1947265, at *5 (explaining that expert's "reliance on his own accounting experience . . . and [the plaintiff's] financial records undercuts [the defendant's] assertion" that expert based his conclusions solely on information received from plaintiff's president and another person in the industry).

Moreover, although McDonough acknowledged that he did not compare earlier projections to actual performance in past years to ascertain their accuracy, he did conduct such an analysis for the first few months of 2014 and found the projections to be quite accurate.[15] McDonough Depo. Tr. 68:14–20; 71:04–12. The Plaintiff has not shown that McDonough's methodology blindly accepted management projections. *See* McDonough Report 43. The existence of data that undermines those projections

---

[15]   When asked whether the accuracy of management's projection "in immediately prior years impact[ed] [his] view about the reliability of projections going forward," McDonough replied that it would depend on "why they had the misses" and whether it was because of "something outside their control that they had no . . . control over." McDonough Depo. Tr. 68:07–20. The Plaintiff can certainly probe his decisions in this case through cross-examination.

might warrant a critique of McDonough's conclusions, but that does not make his testimony inadmissible. Ultimately, the Plaintiff can probe the reasonableness of McDonough's reliance on these projections at trial, and a jury can assess his response. *See Packgen v. Berry Plastics Corp.*, 46 F. Supp. 3d 92, 110 (D. Me. 2014) ("[T]he place to question [an expert's use] of his properly supported assumptions is at trial."); *Zuckerman v. Coastal Camps, Inc.*, 716 F. Supp. 2d 23, 28 (D. Me. 2010) (where "adequacy of the foundation for the expert testimony is at issue, the law favors vigorous cross-examination over exclusion"); *Kirouac v. Donahoe*, No. 2:11-cv-00423-JAW, 2013 WL 173475, at *2 (D. Me. Jan. 16, 2013) (quoting *Payton v. Abbott Labs.*, 780 F.2d 147, 156 (1st Cir. 1985)) ("If the factual underpinnings of [the expert's] opinions [are] in fact weak, that [is] a matter affecting the weight and credibility of [the expert's] testimony.").

In summary, on the record before me and considering the arguments raised, I conclude that McDonough's testimony and report are sufficiently reliable and helpful to satisfy Rule 702.

### C.     Defendant's Motion to Exclude

In his report, Plaintiff's expert Craig T. Elson concludes that the Debtor was both insolvent and inadequately capitalized on each Distribution date. Elson Report 5. Specifically, the Debtor was insolvent because it "had no reasonable prospect of generating positive, debt-free, after-tax cash flows post-Explosion and, thus, had no going-concern enterprise value as of each Distribution date." Elson Report 5. Elson further concludes that the Debtor was inadequately capitalized because, given the expectations of a significant negative cash flow from operating a tissue-only mill, "it

was foreseeable that [the Debtor] would deplete available resources, that its access to capital would be limited, and that it would ultimately be forced to liquidate its assets." Elson Report 5.

The Defendant seeks to exclude Elson's testimony and report because he "(1) impermissibly uses hindsight to support his conclusions;" "(2) fails to use any standard and accepted valuation methodology" and, relatedly, "lacks the requisite education, training, and certifications in the valuation field;" and "(3) second-guesses the Debtor's management judgment . . . while ignoring contemporaneous evidence that uniformly shows that the Debtor was solvent and adequately capitalized at the time of the distributions." Def.'s Mot. Exclude 1–2.

### 1.    Use of Hindsight

The Defendant asserts that Elson "relies heavily on hindsight to support the changes he makes to management's 2014 budget to conclude that the Debtor was insolvent and inadequately capitalized." Def.'s Mot. Exclude 3. First, the Defendant contends that Elson repeatedly relies on the Debtor's actual performance in 2014 and 2015 to support his conclusion that the Debtor should have known it could not generate positive cash flow in 2014. Def.'s Mot. Exclude 5. In doing so, the Defendant argues, Elson "ignores the information management had *at the time* it made its budget" and "ignor[es] what management knew or what was knowable *at the time* they made the cost assumptions." Def.'s Mot. Exclude 5 (emphasis in original).

Second, the Defendant argues that Elson "relies on events that occurred in 2014 and 2015 to support his conclusion that the Debtor was inadequately capitalized at the time of the Distributions." Def.'s Mot. Exclude 7.

Finally, the Defendant contends that Elson relies on events triggered by the Debtor's bankruptcy, including the claims[16] filed in conjunction with it, to conclude that the Debtor had significant contingent liabilities at the time of the Distributions, which occurred more than a year earlier. Def.'s Mot. Exclude 5–6. The Defendant notes that the Debtor's outside auditor "carefully analyzed each of these contingent liabilities and obtained outside counsel opinion letters before concluding that the contingent liabilities were neither probable nor quantifiable." Def.'s Mot. Exclude 6.

In response, the Plaintiff argues that "[m]uch of what [the Defendant] characterizes as 'hindsight' was actually 'known or knowable' at the time of the Distributions" and thus was "not hindsight data at all." Pl.'s Opp'n Exclude 4 (ECF No. 181). Where Elson cites to data that post-dates the Distributions, the Plaintiff asserts that "he does so merely to corroborate his conclusions, which is consistent with well-established valuation principles." Pl.'s Opp'n Exclude 4.

Elson himself acknowledges that using hindsight is not proper in a valuation analysis. Elson Depo. Tr. 214:03–05 ("Q Is hindsight permitted in performing valuation analysis? A No."). And he maintains that he did no such thing. First, Elson repeatedly stated that he considered the Debtor's actual performance in 2014 and 2015 to confirm his understanding of what was known or knowable at the time of the Distributions, not to craft his valuation determinations. *See* Elson Depo. Tr. 215:16–22; *see also* Elson Depo. Tr. 221:9–10 ("I'm not taking into account that hindsight in

---

[16]     The Defendant specifically identifies the claims by FERC, Xpress Natural Gas LLC ("**XNG**"), the PACE Industry Union-Management Pension Fund ("**PIUMPF**"), and the U.S. Environmental Protection Agency ("**EPA**"). Def.'s Mot. Exclude 5–6.

performing that assessment. I'm absolutely not."). This is true for both his insolvency and capital adequacy conclusions. *See* Elson Depo. Tr. 207:11–19 ("The information that I have looked at that postdates either of the distribution dates . . . is corroborative of what I think are base-case expectations that should have been developed and could have been developed at the distribution dates. But my opinion with respect to the insolvency of LPT and LPT's inadequacy of capital is based on information that was only known or could have been knowable as of those two distribution dates.").

Elson's report backs up his claims. He appears to examine post-Distribution data for the purpose of confirming or corroborating that pre-Distribution expectations were foreseeably unrealistic or unreasonable.[17] As he explains in his report,

> Generally speaking, valuation analyses should be performed taking into account only information that was known or knowable at the valuation date. Post-valuation date information, unless knowable as of the valuation date, should be disregarded. Nonetheless, for purposes of the analyses and observations set forth herein, consideration was afforded certain post-Distribution date information for purposes of assessing the reliability of the insolvency opinions otherwise developed and set forth above.

Elson Report 58 n.148. There is nothing in Elson's Report that indicates he relied on hindsight to develop his conclusions on solvency and capital adequacy, and thus the Defendant's assertions of unreliability on that basis are unfounded.

---

[17]    With its motion to exclude, the Defendant attached a chart purporting to identify each time that Elson improperly relied on hindsight. *See* Def.'s Mot. Amend Ex. A (ECF No. 178-1). In its Response, the Plaintiff countered each identified instance and explained how it believed the Defendant had mischaracterized Elson's analysis. *See* Pl.'s Opp'n Exclude Ex. 1 (ECF No. 181-1). I have reviewed each of those charts, and I conclude none of these references to post-Distribution data or facts warrants exclusion of Elson's testimony.

Turning to Elson's discussion of contingent liabilities, Elson makes clear that the value of the Debtor's contingent liabilities did not influence his actual conclusion on solvency. A contingent liability is one that is "uncertain and is often highly unlikely to become an actual liability." *Fed. Deposit Ins.Corp. v. Ponce*, 904 F.2d 740, 744 (1st Cir. 1990). Generally, contingent liabilities can factor into a solvency determination, even if they are unlikely to occur, so long as they are known or knowable by the Debtor at the time of the valuation date. *See* 5 Collier on Bankruptcy § 548.05 (16th Ed.) (explaining that, "[i]n calculating insolvency, courts have counted contingent assets and liabilities, so long as the contingency is capable of reasonable estimation"). Contingent liabilities are simply discounted "by the probability the contingency will occur." *Id.* But, as Elson explains, "[b]ecause [the Debtor] had no positive going-concern value at the dates of the Distributions, [the Debtor] was, by definition, insolvent at those dates, irrespective of the exact amount of liabilities then-existing." Elson Report 46. In other words, any probability of a liability, even if not quantifiable, would mean that the Debtor was insolvent because the Debtor had a zero value for assets. And thus, because Elson determined that there was some probability of at least one of the contingent liabilities, the Debtor was insolvent.[18]

---

[18]   Elson repeatedly stated at his deposition that there was a recognized potential liability associated with the FERC claim that appeared on the Debtor's balance sheets. The existence of that potential liability led him to conclude that "there was a contingency and some probability greater than zero" that FERC would have a claim against the Debtor, even if that probability was not "quantifiable with precision." Because he had already determined that the Debtor had no asset value, subtracting this probability "from zero asset value [got him] a negative number of insolvency." Elson Depo. Tr. 178:08–25. In other words, "the existence of any amount demonstrate[d] a condition of insolvency." Elson Depo. Tr. 179:25–180:02.

Elson does go on to discuss the liabilities that the Debtor actually owed in the Bankruptcy proceedings. Elson Report 47–50. However, the Defendant does not explain how this "review" of the Debtor's liabilities renders Elson's testimony unreliable when it did not factor into his ultimate conclusion. Nor am I convinced that Elson "relie[d]" on the Bankruptcy proceedings to develop his opinion on the existence and likelihood of those contingent liabilities. According to Elson, the liabilities he discussed were generally known by and foreseeable to the Debtor's management at the time of the Distributions, even if their exact amount was undetermined.[19] *See, e.g.*, Elson Depo. Tr. 212:15–19 (explaining that the liabilities had some positive nominal value, but maintaining that this was not determinative because the Debtor's going-concern value at the time of the Distributions was zero).

---

[19]     In terms of other contingent liabilities, Elson explained that it was foreseeable to the Debtor's Board prior to the December 2013 Distribution that there would be some liability to XNG, even if no actual claim had yet accrued. Elson Report 47; Elson Depo. Tr. 197:25–198:18. The Debtor and XNG had contracted for XNG to deliver natural gas to the Mill, but after the explosion at the Mill, the Debtor was no longer taking the amount required by that contract. Although XNG's claim had not formally arisen by the December 2013 Distribution—because the time for performance in the contract ended in February 2014—and although the amount owed was uncertain, Elson stated that "the existence of the dispute and potential for payments owed to XNG was foreseeable as of December 2013." Elson Report 47. By the time of the May 2014 Distribution, the Debtor and XNG "had already been in discussions." Elson Report 47.

Elson also explained that it was foreseeable that there would be some liability to the EPA and PIUMPF when the Debtor inevitably shut down. Elson Report 48–50; Elson Depo. Tr. 210:18–213:06 (explaining his opinion that "the shutdown of [the Debtor] would ultimately manifest itself," "given base-case cash flow expectations for [the Debtor]" and that "in those circumstances a potential liability" to the EPA "could manifest" itself); Elson Depo. Tr. 203:18–22 (same for PIUMPF).

Again, Elson concluded that there was some nominal amount greater than zero associated with each contingent liability. And because the Debtor's going concern asset value was zero, subtracting that positive nominal amount from zero would push the Debtor into insolvency. Elson Report 46; Elson Depo. Tr. 212:15–19. The fact that the likelihood of the loss could not be determined at the time of the Distributions was not important to Elson's analysis because *any* possibility of loss would make the Debtor insolvent.

In sum, the Defendant fails to identify any instance where Elson relied on hindsight in such a way that would render his testimony unreliable or unhelpful.

### 2.    Elson's Methodology and Qualifications

The Defendant next asserts that the Elson Report is unreliable because Elson fails to utilize any standard or reliable valuation methodology. Def.'s Mot. Exclude 7–10. The Defendant states that, "[w]hile there is no singular methodology" for determining fair valuation under the Balance Sheet Test, "there are three standard (and commonly accepted) approaches utilized by valuation experts." Def.'s Mot. Exclude 8 (identifying them as the Income Approach, the Asset Approach, and the Market Approach). The Defendant asserts that Elson used none of these approaches in his analysis and that he "did not attempt to ascribe *any* value to the Debtor at the time of either of the Distributions (or any other date for that matter)." Def.'s Mot. Exclude 9 (emphasis in original). Finally, the Defendant maintains that "Elson's conclusion that the Debtor could only generate a negative cash flow in 2014 is *not* the same as ascribing a value to the Debtor." Def.'s Mot. Exclude 10 (emphasis in original).

The Defendant then critiques Elson's qualifications, asserting that he "has no valuation credentials" and "no formal education or training in business valuation" and that his report "fails to meet the uniform standards for professional appraisal practices." Def.'s Mot. Exclude 8–9. In the Defendant's motion, these assertions appear to be the Defendant's attempt to "explain why Elson did not use any standard valuation approach," rather than an attempt to establish that Elson is unqualified as

an expert.[20] Def.'s Mot. Exclude 9. However, in its Reply Brief, the Defendant seems to take the argument further, asserting that "Elson is not qualified to give an opinion *through this report in this case*."[21] Def.'s Reply Mot. Exclude 2 (emphasis in original) (ECF No. 188).

In terms of Elson's qualifications, the Plaintiff notes that Elson has a Bachelor's degree and Master's degree with finance concentrations, that he has 35 years of experience performing financial and valuation analyses, and that he has successfully performed valuation work in multiple cases. Pl.'s Opp'n Exclude 2–3. The Plaintiff adds that, although Elson has no paper industry experience, neither does McDonough. Pl.'s Opp'n Exclude 2 n.2.

Federal Rule of Evidence 702 requires that, before giving testimony as an expert, a witness must be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. But it is "not required that experts be 'blue-ribbon practitioners' with optimal qualifications." *United States v. Vargas*, 471 F.3d 255, 262 (1st Cir. 2006). Moreover, nowhere does Rule 702 state that an expert must be bound by uniform professional standards to be considered qualified. *See First*

---

[20]     For example, the Defendant contends that Elson's lack of credentials is important because it means that Elson "is not 'constrained' by any professional standards . . . unlike, for example, [the Defendant's] expert, Edward McDonough, who is a Certified Public Accountant and holds the Accredited in Business Valuation certification (ABV) issued by the American Institute of Certified Public Accountants." Def.'s Mot. Exclude 8–9 n.8.

[21]     The Defendant also repeatedly cites to a case in which a court in another district criticized Elson's analysis and testimony. *See In re Bachrach Clothing, Inc.*, 480 B.R. 820 (Bankr. N.D. Ill. 2012). However, as the Plaintiff points out, Elson's testimony was not excluded in that case. Rather, the judge—acting as the factfinder—criticized Elson's analysis in the course of explaining why an opposing expert was more persuasive. *See id.* at 859, 873 (explaining that "Elson's opinion was not persuasive" and that the other expert's analysis "was more convincing than Elson's"); Pl.'s Opp'n Exclude 3.

*Marblehead Corp. v. House*, 541 F.3d 36, 41 (1st Cir. 2008) (explaining that, "[w]hile a certified financial planner who focuses entirely on individual investment decisionmaking would also have been qualified to provide this testimony," the court was "unconvinced" that the expert's own qualifications made him unqualified). Elson has relevant education and extensive experience in this field, and he is qualified to give his opinion here.

Turning to the methodology Elson used, the Plaintiff points out that "Elson clearly states that his analysis is based on a DCF [(Discounted Cash Flow)] analysis," and cites to a section of the Elson Report in which Elson describes that method, adding that "it is exactly the same description given by McDonough." Pl.'s Opp'n Exclude 7 (emphasis omitted). It is clear from his report that he understood and considered the DCF analysis, a point that the Defendant does not dispute. *See* Elson Report 6; Def.'s Reply Exclude 4. Ultimately, however, Elson explains that he did not conduct a DCF analysis because he determined that there was "no expectation that [the Debtor] is going to be able to generate positive debt-free, after-tax cash flows." Elson Depo. Tr. 69:11–13. Therefore, "the discounted present value of those assets collectively deployed is zero." Elson Depo. Tr. 69:13–19 ("Discounting a negative number by a discount rate gets you no going concern value."). The Defendant cites no case in which an expert was disqualified for failing to apply the DCF method after determining that the method was unnecessary or unhelpful.[22] The Defendant can

---

[22]    The Defendant cites to other cases where courts have excluded testimony because the expert did not employ a DCF analysis. *See* Def.'s Mot. Exclude 9–10 (citing *In re Med Diversified*, 334 B.R. 89, 99 (Bankr. E.D.N.Y. 2005); *Lippe v. Bairnco Corp.*, 288 B.R. 678, 689 (Bankr. S.D.N.Y. 2003)). However, in those cases, the courts had several other quibbles with the expert's methodology. In *In re*

question Elson about that determination on cross-examination, but it does not render his testimony unreliable.

### 3.    Consideration of Other Evidence

In its final attack on the Elson Report, the Defendant asserts that Elson "ignores certain contemporaneous data[23] of both solvency and capital adequacy that is inconvenient for the [Plaintiff]."[24] Def.'s Mot. Exclude 10. The Plaintiff disputes that Elson ignored any of the data identified by the Defendant. Pl.'s Opp'n Exclude 8. But, even if he had, the Plaintiff asserts this critique "would merely be fodder for cross-examination" because "it is beyond dispute that Elson's opinions are based on

---

*Med Diversified*, for example, the court noted that the expert "never determined that the DCF method was inappropriate as a valuation method under the circumstances" and "failed to offer an adequate explanation" why he did not apply it. 334 B.R. at 99. Likewise, in *Lippe*, the court noted that the expert failed to apply the DCF method and offered no explanation—or a cursory explanation—for his decision not to. 288 B.R. at 689 (expert "elected not to do a DCF analysis and when asked at his deposition why he did not, he responded: 'I can't tell you. I didn't try.' "). Here, Elson repeatedly explained in his deposition and his report why he concluded that the DCF analysis was not useful. *See* Elson Report 5-6; Elson Depo. Tr. 69:11-72:17; 284:9-19.

[23]    Specifically, the Defendant contends that Elson ignored the following: multiyear projections that were presented to the Debtor's Board prior to each Distribution; the 2014 audit opinion from Berry Dunn; the fact that the Debtor had significant cash balances and no interest-bearing debt at the time of the Distributions; the fact that the Debtor was able to obtain financing from third-party lenders after the Distributions; the March 2014 sale of the Debtor's Class B shares, which implied a value of the Debtor's equity of at least $10 million; and testimony from people who were involved with the Debtor that they believed the Debtor was solvent at the times of the Distributions. Def.'s Mot. Exclude 12–14.

[24]    The Defendant also asserts that Elson "fails to adequately explain the basis for his adjustments to the 2014 budget." Def.'s Mot. Exclude 10. Specifically, the Defendant argues that Elson "opines that the Debtor should have assumed a $200 per ton increase in the cost of production" after the boiler explosion, but that this estimate was derived from a 2008 analysis and Elson does not explain how that estimate was appropriate five years later. Def.'s Mot. Exclude 11. In its Reply, the Defendant again contends that "Elson did not perform any analysis to determine whether the $200/ton cost savings was still relevant in 2013." Def.'s Reply Exclude 6 (ECF No. 188). This entirely ignores Elson's deposition testimony, in which he explains that he reviewed several other more recent data and reports. *See* Elson Depo. Tr. 105:06–20; 108:25–109:23.

his thorough analysis of reams of historical data . . . *i.e.*, 'sufficient facts and data.' " Pl.'s Opp'n Exclude 8 (quoting Fed. R. Evid. 702).

I conclude that Elson sufficiently considered the data that the Defendant identifies. As spelled out in the Plaintiff's response, Elson discussed each of the identified sources of information in his report, deposition, or both. Whether certain data should have been given more weight than others can be fleshed out in cross-examination and weighed by the factfinder at trial.

In summary, on the record before me and considering the arguments raised, I conclude that Elson's testimony and report are sufficiently reliable and helpful to satisfy Rule 702.

## CONCLUSION

For the reasons stated above, the Court **GRANTS in part** and **DENIES in part** the Plaintiff's motion to amend the Complaint. The Court further **DENIES** the Plaintiff's motion to exclude the expert testimony of Edward M. McDonough and **DENIES** the Defendant's motion to exclude the expert testimony of Craig T. Elson.


SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 17th day of July, 2020.