## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

OFFICIAL COMMITTEE OF        )
UNSECURED CREDITORS,         )
                             )
            Plaintiff,       )
                             )
v.                           )        Docket No. 1:18-cv-68-NT
                             )
CALPERS CORPORATE PARTNERS   )
LLC, *et al.*,               )
                             )
            Defendants.      )

## ORDER ON DEFENDANT'S MOTION FOR PARTIAL
## SUMMARY JUDGMENT

Plaintiff Official Committee of Unsecured Creditors ("**Plaintiff**" or "**Committee**") seeks to avoid and recover certain transfers made by Lincoln Paper and Tissue LLC ("**LPT**" or the "**Debtor**") to CalPERS Corporate Partners LLC ("**Defendant**" or "**CCP**").[1] Before me is the Defendant's motion for partial summary judgment (ECF No. 197), which asserts that the Debtor (1) was not left with unreasonably small capital or assets as a result of either transfer and (2) was paying its debts as they came due at the time of the transfers. For the reasons stated below, I **DENY** the Defendant's motion.

---

[1]      The Plaintiff originally brought its claims against several other defendants but has since dismissed those claims, either through a stipulation of dismissal or through the filing of its First Amended Complaint. *See* ECF Nos. 8, 42, 145.

## BACKGROUND

### I.    Statutory Background

Under 11 U.S.C. § 548, a bankruptcy trustee may void a transfer of any interest or obligation of the debtor if the debtor voluntarily or involuntarily "received less than a reasonably equivalent value in exchange for such transfer or obligation" and the debtor was in one of the financial conditions specified by the statute. 11 U.S.C. § 548(a)(1)(B). Relevant to this case,[2] the possible financial conditions that would establish a fraudulent transfer include that the debtor: (1) "was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation" ("**Solvency Test**"); (2) "was engaged in business or a transaction [or was about to], for which any property remaining with the debtor was an unreasonably small capital" ("**Unreasonably Small Capital Test**"); or (3) "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured" ("**Payment of Debts Test**"). 11 U.S.C. § 548(a)(1)(B). The target of § 548(a)(1) is constructive fraud—transfers for which fraud is presumed, despite lack of actual intent to defraud. *See Horwitt v. Sarroff*, No. 3:17-cv-1902 (VAB), 2020 WL 5504471, at *24 (D. Conn. Sept. 11, 2020); 5 Collier on Bankruptcy ¶ 548.05 (16th ed.).

Federal law also affords a bankruptcy trustee the right to avoid a transfer that is voidable under applicable state law. 11 U.S.C. § 544(b). Maine has adopted the

---

[2]    In addition to the conditions set forth in (1), (2), and (3), the statute includes another alternative scenario—not pleaded by the Plaintiff—that could authorize avoidance of transfers. *See* 11 U.S.C. § 548(a)(1)(B)(ii)(IV). Because the statute is set up in the alternative, I have omitted that scenario here.

Uniform Fraudulent Transfer Act ("**UFTA**" or "**MUFTA**" when referring to Maine statute specifically), which—like § 548—specifies certain conditions that can establish a fraudulent transfer claim. Under 14 M.R.S. § 3575,

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation . . . Without receiving a reasonably equivalent value in exchange for the transfer or obligations and the debtor: (1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (2) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as the debts became due.[3]

Although the Maine conditions differ from the federal ones, they can likewise be grouped into the "Unreasonably Small Capital Test" and the "Payment of Debts Test." *See In re Maine Poly, Inc.*, 317 B.R. 1, 8 (Bankr. D. Me. 2004) (explaining that the elements of constructive fraud under both statutes "are substantially similar, although not textually identical"). Under both statutes, the plaintiff bears the burden of proving each element. *See In re Jackson*, 459 F.3d 117, 122 (1st Cir. 2006) (stating that a preponderance of the evidence standard applies under both the Bankruptcy Code and New Hampshire's UFTA); *Dev. Specialists, Inc. v. Kaplan*, 574 B.R. 1, 7 n.23 (D. Me. 2017) (noting that burden of proof for constructive fraud under MUFTA is in doubt and citing Law Court case that suggested plaintiff must meet clear and convincing evidence standard) (citing *Morin v. Dubois*, 713 A.2d 956 (Me. 1998)).

---

[3]     Maine also has a separate section that authorizes fraudulent transfer claims based on insolvency. *See* 14 M.R.S. § 3576(1). The Plaintiff omitted that claim from both the original and First Amended Complaint, and I subsequently denied the Plaintiff's motion to add it to the Second Amended Complaint. *See* Order on Pl.'s Mot. Amend and Parties' Motions to Exclude Expert Testimony (ECF No. 189).

## II.    Factual Background[4]

### A.    LPT

LPT operated a pulp, paper, and tissue manufacturing mill in Lincoln, Maine

(the "**Mill**"). SOF ¶ 1. The sole member of LPT is LPT Holding, LLC, ("**LPT**

**Holding**"). SOF ¶ 5. Until 2018, the Board of Managers for both LPT and LPT

Holding consisted of Keith Van Scotter, the Chief Executive Officer of LPT; John

---

[4]    The following background is drawn from the parties combined statements of fact ("**SOF**") (ECF No. 210) or directly from documents in the summary judgment record, which is found at ECF Nos. 196, 200, 201, and 202 ("**Record**").

In several responses and requests to strike, CCP contends that the Committee improperly cited the expert report of Craig T. Elson ("**Elson Report**") to support the Committee's own statements or responses. *See* SOF ¶¶ 32, 34, 46, 48, 87–88, 92–94, 99, 102. The thrust of CCP's argument is that Mr. Elson is not a percipient fact witness and that his report is "unsworn and simply rehashes other evidence of which [he] has no personal knowledge." *See, e.g.*, SOF ¶ 32 (CCP's request to strike). CCP further challenges the Elson Report as argumentative and opinion rather than fact. But, as the Committee points out, the Committee has included a sworn declaration from Mr. Elson in its supplemental record. *See* Decl. of Craig T. Elson ("**Elson Decl.**"), Record #6049–52 (ECF No. 200-25). In that document, Mr. Elson references his report and states, "If called to testify, I would testify consistent with the analysis and conclusions set forth more fully in my Report." Elson Decl. ¶ 3, Record #6049. He goes on to give his opinion on several issues, citing both to consistent opinions in his report and to documents in the Record.

Nonmovants may rely on sworn statements of experts to defeat a motion for summary judgment. *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993). But, although "expert testimony may be more inferential than that of fact witnesses, in order to defeat a motion for summary judgment an expert opinion must be more than a conclusory assertion about ultimate legal issues." *Id.* An expert affidavit "must at least include the factual basis and the process of reasoning which makes the conclusion viable." *Id.*; *see also RTR Technologies, Inc. v. Helming*, 707 F.3d 84, 93 (1st Cir. 2013). In this case, the Elson Report and declaration do not simply recite an opinion on whether the Distributions constitute fraudulent transfers. Rather, both documents cite to documentary evidence, and the Elson Report thoroughly spells out Mr. Elson's reasoning. To the extent that CCP is challenging the underlying facts or Mr. Elson's opinion on those facts, such an argument suggests that there might are disputes that render summary judgment inappropriate.

In another attack, CCP asserts that the Elson Declaration "includes positions that were not previously addressed in either Elson's Report or his deposition testimony." *See* SOF p. 45–47 n.7. But CCP only cites one paragraph from the Elson Declaration to support this point. SOF p. 45–47 n.7 (citing Elson Decl. ¶ 12). I see nothing in that paragraph that constitutes a new position. *See* Elson Report 67–68, Record #4843–44 (discussing Berry Dunn audit); Elson Dep. 38:22–39:14 (stating that he saw nothing to indicate that Berry Dunn reviewed the reasonableness of managements' projections and discussing statements by Berry Dunn witness).

I deny CCP's requests to strike ¶¶ 32, 34, 46, 48, 87, 88, 92, 93, 94, 99, and 102 on these grounds. Unless otherwise noted at the pertinent place in this Order, CCP's other requests to strike are granted either because they have merit or because I have concluded that granting CCP's request does not alter the outcome of this motion.

Wissmann, the Chief Financial Officer of LPT; Rodney N. Fisher; Douglas Meltzer; and Edward Dan Herring (collectively the "**Board**" or "**LPT Board**"). SOF ¶ 7. Both Mr. Meltzer and Mr. Herring were designated to the Board by CCP, which had obtained the right to designate two members from a 2005 loan to LPT. SOF ¶ 89. CCP, Mr. Van Scotter, Mr. Wissmann, and Mr. Fisher are also all members of LPT Holding. SOF ¶¶ 6–7.

### B.   LPT's Operations Before November of 2013

Until November of 2013, LPT operated as an integrated mill, utilizing a recovery boiler (the "**Boiler**") to produce its own pulp and fulfill certain energy and heating requirements. SOF ¶ 8. By doing so, LPT enjoyed cost savings relative to tissue-only mills.[5] SOF ¶ 92.

In early 2013, LPT contracted with Sanabe & Associates, LLC ("**Sanabe**"), an investment firm that specializes in the paper industry. Sanabe analyzed four strategic scenarios in for LPT. According to a January 2013 e-mail, Doni Perl of Sanabe opined that operating LPT without the pulp mill and the paper machines as a tissue-only mill was "the worst case situation" and concluded that "the tissue machines would struggle to survive" on their own. SOF ¶ 95. On February 4, 2013,

---

[5]    Contemporaneous documentation indicates that these cost savings averaged approximately $200 per ton. SOF ¶ 92. If pre-explosion EBITDA for LPT's tissue segment is normalized to account for a $200 per ton incremental cost, then normalized results indicate that LPT would have expected to sustain operating cash flow losses for each year from 2008 through 2012, and for the pre-explosion portion of 2013, aggregating to more than $45.5 million, holding all else constant. SOF ¶ 94. There is additional support for the general proposition that LPT saved money as an integrated mill relative to tissue-only operations. *See* Dep. of Keith Van Scotter 137:23–138:13, Record #5081 (ECF No. 196-42) (language cited by Elson Report).

Sanabe concluded that, "on an unintegrated basis . . . the tissue machines are EBITDA[6] negative." SOF ¶ 96.

The Sanabe report was discussed at a July 3, 2013 Board meeting. SOF ¶ 97. Minutes from that meeting state that Mr. Wissmann "moved the discussion to the issues posed by the decline in paper demand, and the concern of management that, without paper or another source of revenue, the mill's long term prospects [were] not good." SOF ¶ 97. Citing the Sanabe report, Mr. Wissmann also reiterated that LPT "need[ed] to make strategic decisions by acquisition, sale or restructuring that [would] change its operating profile to allow it to address market conditions and survive as a going concern." SOF ¶ 97.

### C.    The Explosion

On November 2, 2013, an explosion at the Mill resulted in significant damage to the Boiler, rendering it inoperable and eliminating LPT's ability to produce its own pulp unless the Boiler was repaired or replaced. SOF ¶¶ 9–10. Following the explosion, LPT filed a claim with its property and casualty insurer, Factory Mutual Insurance Company ("**FM Global**"). SOF ¶¶ 11–12. FM Global provided LPT with a $10 million advance on the insurance claim. SOF ¶ 13.

On December 9, 2013, the LPT Board held a meeting to consider whether to rebuild the Boiler or pursue an alternative business model focusing solely on the tissue operation, as well as to "discuss whether or not to authorize management to negotiate with FM Global on cash settlement for the recovery event." SOF ¶ 14. LPT's

---

[6]    EBITDA stands for "earnings before interest, taxes, depreciation, and amortization."

2014 tissue-only budget projected that LPT would have negative EBITDA of $5.15 million in 2014. SOF ¶ 98. According to the minutes from the December 9 meeting, Mr. Herring stated that "there may be significant risks with [LPT] remaining a going concern given the uncertainty regarding future operations, bank financing and FERC." SOF ¶ 100. Mr. Wissmann also reportedly "noted that he shared the concern, given the uncertainty regarding the amount of the business interruption insurance recovery (based upon paper pricing and projected profitability) and his concern with respect to [LPT's] ability to secure commercial financing for operations going forward." SOF ¶ 100. The package that accompanied the Board meeting also contained a slide on distributions to LPT Holding's members but the minutes do not indicate that it was reviewed. SOF ¶ 101.

The Board decided to authorize Mr. Van Scotter and Mr. Wissmann to negotiate a cash settlement of the insurance claim in lieu of rebuilding the Boiler and to continue as a nonintegrated tissue mill. SOF ¶ 15. On December 10, 2013, the Board authorized LPT to accept $49.8 million from FM Global to settle the insurance claim.[7] SOF ¶ 16. Thereafter, LPT operated as a nonintegrated tissue mill, continuing to operate tissue machines and produce tissue products through August of 2015. SOF ¶¶ 15, 18. In September of 2015, LPT filed for Chapter 11 bankruptcy. SOF ¶ 153.

---

[7]     This amount included the $10 million FM Global had already paid to LPT as an advance. SOF ¶ 16. The rest of the insurance proceeds was paid out in two tranches: the first $30 million was paid directly to LPT and the remaining $9.8 million was paid to LPT Holding on LPT's behalf. SOF ¶ 17.

### D.     The Distributions

In December of 2013 and May of 2014, the LPT Board authorized distributions to LPT Holding (collectively, the "**Distributions**"). The Committee asserts that these Distributions constituted constructive fraud. Below, I discuss the facts of each Distribution, as well as the financial condition of LPT at the times surrounding each Distribution.

#### 1.     December 2013 Distribution

On December 17, 2013, one week after the LPT Board authorized the insurance settlement, the Board authorized LPT to distribute $3 million to LPT Holding ("**December 2013 Distribution**"). SOF ¶ 19. LPT Holding, in turn, was authorized to make a distribution to its members, and CCP received a distribution of $1,050,000. SOF ¶¶ 20–22. In connection with this distribution, CCP's Class A Member received $1,039,500 and CCP's Class B Member (Mr. Meltzer or an affiliated entity) received $10,500. SOF ¶ 90.

##### a.     Berry Dunn Audit[8]

LPT's management prepared monthly and yearly financial statements and enlisted Berry Dunn McNeil & Parker, LLC ("**Berry Dunn**") to independently audit those statements. SOF ¶¶ 28–29. On July 10, 2014, Berry Dunn released its audit of LPT's financial statements for the period ending on December 31, 2013 ("**2013**

---

[8]     Although this audit was released after the May 2014 Distribution, I discuss it here because it addresses LPT's financial statements through the year ending on December 31, 2013.

**Audited Financial Statements**"),[9] and issued a clean audit opinion ("**2014 Audit Opinion**"). SOF ¶ 32. As part of its auditing process, Berry Dunn interviewed LPT's management, reviewed LPT's assumptions in creating its financial statements, and contacted LPT's outside counsel to provide opinions on various risks and liabilities. SOF ¶ 30. Berry Dunn also relied on certain representations from LPT management. SOF ¶ 30. Berry Dunn opined that LPT's financial statements conformed with Generally Accepted Accounting Principles ("**GAAP**").[10] SOF ¶ 31. At that time, Berry Dunn did not qualify its opinion or question its going concern assumption concerning LPT. SOF ¶ 34.

> **b.    LPT's Cash Flow and Cash Balances Before and After the December 2013 Distribution**

LPT had positive cash flow from operations as an integrated tissue mill from 2010 to October of 2013, before the explosion occurred. SOF ¶ 36. LPT also had a positive cash balance for each month between December 2013 and September 2015. SOF ¶ 37.

On November 30, 2013, before the December 2013 Distribution, LPT had $15.3 million in cash and temporary investments. SOF ¶ 38. Following that first Distribution, on December 31, 2013, LPT had $31 million in working capital and $57.2 million in book equity, which included $13.383 million in cash and temporary

---

[9]    In connection with the 2014 Audit Opinion, Berry Dunn audited LPT's balance sheet as of December 31, 2013. SOF ¶ 33. CCP initially states that Berry Dunn reevaluated the balance sheet in July of 2014 but does not request to strike the Committee's objection to this point.

[10]    The Liquidating Trustee for the Debtor, Mark Stickney, also testified that he went through LPT's books and records and found that LPT had a diligent process, adding that he did not see anything that led him to believe that the historical records were misstated. SOF ¶ 35.

investments. SOF ¶¶ 39–40. Board members stated at their depositions that, at the time of the December 2013 Distribution, they believed that LPT was solvent and/or had sufficient capital.[11] SOF ¶ 46. Mr. Herring stated at his deposition that at the time he believed that LPT had sufficient cash to meet its operating needs and its forecasted needs for capital expenditures and had enough additional cash available for distribution. SOF ¶ 47. Mr. Wissmann similarly stated that he believed that LPT had significant cash above liabilities. SOF ¶ 47.

### c.    Other Financial Considerations

LPT was largely up-to-date with its accounts payable both before and immediately after the December 2013 Distribution. On December 12, 2013, 93 percent of LPT's accounts payable were either current or within 30 days of their due dates. SOF ¶ 80. After that distribution, on December 31, 2013, 100 percent of LPT's accounts payable were either current or within 30 days of their due dates. SOF ¶ 81. In addition, Board members have stated that, at the time of the December 2013 Distribution, they believed that LPT was paying its debts as they came due and would be able to continue to do so. SOF ¶ 87.

Nevertheless, there were indications that LPT's future was in question. Minutes from the December 17 Board Meeting state that the "Board also discussed what the long term approach should be to operating the Mill, and management noted

---

[11]    The Committee denies this assertion, citing to the entire Elson Report. However, even if the facts show that it was unreasonable to believe that LPT would be able to pay its debts as they came due, that does not refute the statements made by Board members at their own depositions regarding what they personally believed at the time. For the same reason, the Committee's denials to ¶¶ 48, 87, and 88 also fail to refute the statements of fact.

that the Board would need to consider whether operating the Mill as a stand-alone Mill made economic sense, or whether it would make more sense to shut the Mill down, and pay the closing costs." SOF ¶ 108. Moreover, around the time of the December 2013 Distribution, LPT lost two tissue customers. Prior to the December 2013 Distribution, one of LPT's largest tissue brokerage customers, Hansen Paper Company ("**Hansen**"), declared bankruptcy and ceased operations.[12] SOF ¶ 102. As a result of Hansen's bankruptcy, LPT's sales to Hansen went from $6,128,469 in 2013 to $0 in 2014. SOF ¶ 103. In addition, on December 10, 2013, Mr. Van Scotter informed LPT's sales team and others at the company that Oasis, one of LPT's largest tissue customers in 2013, was giving its 90-day notice of termination of its tissue purchases from LPT. SOF ¶ 104. Subsequently, the tissue purchased from LPT by the broker that worked with Oasis decreased from nearly $19 million in 2013 to approximately $9 million in 2014. SOF ¶¶ 105–06; *see also* SOF ¶ 107 (noting that LPT sold 3,592 tons to Oasis in 2012, 2,727 tons in 2013, and 892 tons in the first couple of months of 2014 to close out the orders).

---

[12]     CCP requests to strike this statement of fact because the Committee supports it only with a citation to the Elson Report. SOF ¶ 102 (CCP's Response). If the request is not granted, CCP provides a qualification, noting that the Elson Report does state that Hansen declared bankruptcy and ceased operations but does not cite to any documents that indicate when Hansen declared bankruptcy or ceased operations. SOF ¶ 102 (CCP's Response). Given CCP's admission to ¶ 103, which sets forth the decline in LPT's sales to Hansen "[a]s a result of Hansen's bankruptcy," it does not appear that CCP disputes that Hansen went bankrupt and that the bankruptcy led to a loss of sales. Moreover, CCP does not offer any evidence to refute the suggested timeline of Hansen's bankruptcy. Reading this record in the light most favorable to the Committee, I can infer that Hansen's bankruptcy occurred some time in 2013.

### 2.    May 2014 Distribution

On May 16, 2014, Mr. Van Scotter, Mr. Wissmann, and Mr. Fisher[13] authorized LPT to distribute $4 million to LPT Holding ("**May 2014 Distribution**"). SOF ¶ 23. This money came from a receivable held by LPT from LPT Holding. SOF ¶ 23. LPT Holding was then authorized to make a distribution to its members, and CCP received a distribution of $1,407,035 later that month. SOF ¶¶ 24–25. In connection with this distribution, CCP's Class A Member received $1,392,965 and CCP's Class B Member (Mr. Meltzer or an affiliated entity) received $14,070. SOF ¶ 91.

### a.    LPT's Cash Flow and Cash Balances Before and After the May 2014 Distribution

As noted above, LPT had a positive cash balance for each month between December 2013 and September 2015. SOF ¶ 37. Before the May 2014 Distribution, on April 14, 2014, LPT had $26.8 million in working capital and $52.1 million in book equity, which included $5.1 million in cash and temporary investments.[14] SOF ¶¶ 41–42. On May 30, a couple of weeks following the May 2014 Distribution, LPT had $21.6 million in working capital and $47.2 million in book equity, with $3.1 million in cash and temporary investments. SOF ¶¶ 44–45. According to testimony from several Board members, the Board believed that LPT was solvent and/or had sufficient capital at the time of the May 2014 Distribution.[15] SOF ¶ 48. Mr. Van Scotter believed

---

[13]    Mr. Meltzer and Mr. Herring, both of whom served on the Board as appointees of CCP, did not vote. SOF ¶ 23.

[14]    Moreover, on or about May 1, 2014, LPT Holding had $9.8 million in cash from the insurance proceeds, which was fully offset by a payable that LPT Holding owed to LPT. SOF ¶ 43.

[15]    As the Committee notes, Mr. Herring stated at his deposition that he was "a conservative financial person" and that he wanted "to see financial analysis and some forecasting relative to the company's position before [he] would vote for any such distribution." Dep. of Edward D. Herring

that LPT had "very positive working capital, accounts receivable and inventory and low [accounts payable] and cash in the bank," adding that it was "clear" to him that "solvency was not even close to being an issue." SOF ¶ 49.

Nevertheless, the Board was certainly aware that LPT's cash had been declining. In a May 1, 2014 Board Update, a chart entitled "Daily Cash Since Jan 1, 2014" showed that LPT's cash had decreased from nearly $14 million to about $4 million over approximately three months. SOF ¶ 117. Minutes from the May 1, 2014 Board meeting state,

> John Wissmann next directed the Board to various financial reports included in the Board package, reviewing EBITDA for February and March 2014 and projected full year 2014. Discussion ensued focusing on [LPT's] cash burn rate and prospects for slowing the burn rate over the next couple months given forecasted downtime. Mr. Wissmann reported that [LPT] will likely need to tap into the $9.8mm of liquidity at the parent company level and consume $4-$5mm of that amount on capital and operating items this year.

SOF ¶ 118.

### b.    Other Financial Considerations

As with the December 2013 Distribution, LPT was mostly up-to-date with its accounts payable before and after the May 2014 Distribution. On May 2, 2014, 99 percent of LPT's accounts payable were either current or within 30 days of their due dates. SOF ¶ 82. After that distribution, on May 22, 2014, 100 percent of LPT's accounts payable were either current or within 30 days of their due dates. SOF ¶ 83. Board members have stated that, at the time of the distribution, they still believed

---

("**Herring Dep.**") 69:07–11, Record #5324 (ECF No. 196-46). Before he had a chance to review the analysis in depth, three other Board members voted to approve the Distribution, rendering his vote unnecessary. Herring Dep. 69:12–70:08, Record #5324.

that LPT was paying its debts as they came due and would be able to continue to do so. SOF ¶ 88.

At the same time, there were signs of concern with LPT's financial state. In a March 3, 2014 Board Update, LPT management acknowledged that "[n]et cash burn YTD ha[d] been worse than previously expected with higher costs (energy), lower production, and higher transition costs than anticipated when reviewed in December." SOF ¶ 110. One day later, Mr. Van Scotter sent an e-mail to LPT's sales team stating, "I guess you should also add that given we are losing money and that the pricing of parent rolls that we have been receiving do not support a viable business." SOF ¶ 111. Mr. Van Scotter continued, "A message that needs to be given to . . . all customers is that parent roll pricing is too low and we are no longer in a position to have our pulp mill subsidize converters and brokers." SOF ¶ 111. In an April 4, 2014 e-mail to Jonathan Mishkin, Sanabe's founder and managing partner, Mr. Wissmann stated that LPT value was "heading to zero," adding, "Time to prepare lifeboat by selling pieces . . . ." SOF ¶ 116.

In addition, in March of 2014, LPT management decided to implement a price increase. On March 25, 2014, Mr. Wissmann e-mailed the Board, stating "[w]e are going for a very aggressive price increase that may make it tough to run full in the next few months." SOF ¶ 112. In an analysis captioned "LPT Price Increase Customer Impact 3-26-2014" and a cover e-mail, Cash Cappel, LPT's Executive Vice President of Sales and Marketing, identified 1,966 tons of "measurable" monthly lost sales expected to result from LPT's recently implemented price increases. SOF ¶ 113. This

included an estimated 200 tons per month of white tissue sales and 120 tons per month of colored tissue sales related to a single customer. SOF ¶ 113. Mr. Cappel subsequently updated LPT management on May 6, 2014, explaining that LPT was losing 230 tons per month of white tissue sales and 230 tons per month of colored tissue sales from that customer "due to implementing the necessary price increases." SOF ¶ 114. Ultimately, LPT's sales to the specified customer declined from $13,664,353 in 2013 to $11,461,795 in 2014. SOF ¶ 115.

Leading up to the May 2014 Distribution, LPT implemented a 10 percent salary cut and terminated employer matching contributions to its employees' 401(k) plan. SOF ¶ 119. In a May 7, 2014 e-mail, Bill Peterson, LPT's head of Human Resources, stated that he "recognized that we have to do what makes sense to have the business survive." SOF ¶ 120. On the day that the May 2014 Distribution was approved, Mr. Wissmann e-mailed the Board and other about LPT's most recent financial projections for 2014 and 2015, stating:

> From these projections, management anticipates that [LPT] will require $4 million to fund losses and capital programs over this period. As of today, there is no debt at either the operating (Lincoln Paper and Tissue LLC) or parent company levels (LPT Holding LLC). Our $7 million of net working capital could be used to secure a bank provided revolving credit facility which could provide liquidity of approximately $5 million to fill this future need for cash.

SOF ¶ 121.

### E.    LPT's Financial Condition After the Distributions

At a June 19, 2014 Board Meeting, "Mr. Van Scotter and Mr. Wissmann briefed the Board on the status of LPT's audit, liquidity issues and the possible need for securing working capital financing, and management's turnaround plan for business

operations." SOF ¶ 125. Board discussion then ensued, "with Mr. Van Scotter and Mr. Wissmann leading the Board through management's efforts to reduce fixed costs and negative operating results, both in the short term and on a longer term basis as well." SOF ¶ 125. That same month, Mr. Wissmann also reported to the Board that $1 million had been transferred from LPT Holding to make vendor payments and that there was still approximately $4.8 million in the LPT Holding account. SOF ¶ 85.

By the fall of 2014, LPT management was looking for financing from a variety of lenders to bridge pressure on LPT's operating liquidity. SOF ¶ 126. In an October 1, 2014 e-mail to two fellow Senabe employees, Mr. Mishkin stated that LPT "still [has] a real cash problem," adding that LPT's "forecast shows them down to $500,000 of liquidity at the end of October." SOF ¶ 124. According to minutes from the October 30, 2014 Board meeting, Mr. Wissmann informed the Board "that cash [was] getting tight and that [LPT] [would] not have adequate funds to go through the winter absent additional funding." SOF ¶ 127. Mr. Wissmann also stated that he was working to raise between $4 and $6 million to fund the installation of a new steam turbine[16] and to "address operating cash needs," and he explained that LPT's options for funding were "limited to state funding" and "alternative (non-bank) and distressed lenders." SOF ¶ 127. Although Mr. Wissmann stated that the turbine would pay for itself, it

---

[16]     CCP states that LPT "decided to install a steam turbine to lower its energy costs," Def.'s Reply (ECF No. 209), and notes that Mr. Wissmann told the Board in October of 2014 that the "cost savings generated by the turbine would likely pay for itself in the first year." SOF ¶ 127. Neither party provides facts about the installation and operation of the turbine, but it appears that ongoing issues with the turbine" resulted in losses to LPT in late 2014 and early 2015, including $700,000 in losses in February of 2015. SOF ¶ 146.

appeared that LPT's future was considered dependent on securing the loan. *See* SOF ¶¶ 124, 127. Mr. Mishkin told his Senabe colleagues that "[o]nly the $4 million turbine loan saves [LPT]," which was why they were "so aggressive about securing the loan," and that even that "assumes positive EBITDA for Oct and Nov." SOF ¶ 124 (adding that "[t]hat's also why they aren't letting anyone else go; they cannot afford the severance").

### 1.   LPT's Access to Credit

#### a.   FAME

In September of 2014, LPT applied for a $1 million Economic Recovery Loan Program loan from the Finance Authority of Maine ("**FAME**"). SOF ¶ 59. The Economic Recovery Loan Program was "established to provide loans to businesses that do not have sufficient access to credit but demonstrate the ability to survive, preserve and create jobs, and repay the obligations."[17] 10 M.R.S. § 1026-J; SOF ¶ 130. For a business to be eligible for the program, FAME must determine that the business "has insufficient access to other funds and that the loan is necessary in order for the public benefits of the application to be realized." 10 M.R.S. § 1026-J(1)(C); SOF ¶ 131. For LPT, the stated purpose of the loan was for term working capital to partially fund the new steam turbine and to enable LPT "to continue to make its supplier and other current obligations payments." SOF ¶ 59; Dk. 196-32, #4722. On December 9, 2014, LPT and FAME entered into a Loan Agreement for a $970,000 loan to LPT (the

---

[17]     FAME's representative testified at his deposition that the default rate of Economic Recovery Loan Program loans is "somewhere between 15 and 20 percent," whereas a bank lender would expect "closer to 2 percent." SOF ¶ 133. He added that they "joke a lot about how sometimes [FAME Loans] turn into grants." SOF ¶ 134.

"**FAME Loan**") with an interest rate of 5.25 percent. SOF ¶¶ 60–61, 63. LPT and FAME also entered into (a) a Security Agreement and (b) a Standby and Subordination Agreement with Mr. Wissmann, Mr. Van Scotter, and Mr. Fisher. SOF ¶ 62. Personal guarantees were not required for the FAME Loan. SOF ¶ 64.

In connection with approving the FAME Loan and as required by statute, FAME evaluated whether LPT was "creditworthy and reasonably likely to repay the loan." 10 M.R.S. § 1026-J(1)(B); SOF ¶ 65. According to a FAME representative, "reasonably likely to repay the loan" means repaying either through cash flow or by sale of collateral.[18] SOF ¶ 65. In the Commercial Credit Analysis, FAME stated that "LPT's balance sheet ha[d] been liquid for the past four years," LPT's "balance sheet ha[d] been solvent in each of the past four years," LPT's balance sheet as of the end of September 2014 "remain[ed] liquid, solvent and lightly leveraged," and "cash flow for YTD 8/31/14 . . . was a (decrease) in cash of ($11,128,000) which was paid from the starting cash of $13,383,000 resulting in an ending cash balance of $2,255,000." SOF ¶ 66. At the same time, in the "Weaknesses" section of the FAME Commercial Credit Analysis, FAME notes, "Inadequate YTD cash flow; Declining revenue trend; Competitive industry perceived as declining, except for the tissue segment which is holding its own/increasing; [and] No personal guarantees provided." SOF ¶ 128. The analysis further reflected that LPT's own projections showed a negative cash balance by November of 2014. SOF ¶ 129. In approving the FAME Loan, FAME felt

---

[18]    CCP objects to the Committee's qualification of this fact, asserting that it is "non-responsive and not a qualification of the statement of fact in Paragraph No. 65." SOF ¶ 65. I disagree and deny CCP's request to strike.

reasonably confident that LPT would repay the loan because of a 9-to-1 ratio of estimated collateral value to debt. SOF ¶ 67.

On December 10, 2014, FAME funded the FAME Loan. SOF ¶ 68. The stated "public benefit" of the loan was to prevent LPT from "get[ting] into the situation of several other Maine mills that have had recent issues." SOF ¶ 132. By April of 2015, due to LPT's "significant current liquidity issue," FAME granted a six-month deferral of all payments, and by July of 2015, due to LPT's "precarious situation," FAME agreed to subordinate its loan to up to $1.5 million of new loans "to bring the business back to more normal terms with its suppliers." SOF ¶¶ 136–37. Ultimately, FAME was forced to "charge off" a portion of the FAME Loan as uncollectible. SOF ¶ 138.

### b.   Siena Lending Group

In or about December of 2014, LPT applied for a $6 million three-year asset based revolving credit facility from Siena Lending Group ("**Siena**") to fund LPT's future working capital needs and to partially fund the new steam turbine (the "**Siena Loan**"). SOF ¶ 69. Siena's clients "typically cannot access traditional financing from banking institutions." SOF ¶ 139. Siena's representative testified that borrowers who come to Siena typically do so because they are unable to borrow funds from more traditional banks and that Siena usually charges a higher interest rate than traditional banks. SOF ¶ 140. Moreover, the risk profile of the loans that Siena makes are higher risk than loans that traditional banks typically make. SOF ¶ 141. According to Siena's representative, in its two years of lending, Siena had only one loan that was not repaid, but 30 of its approximately 100 loans had gone into default and 5–10 percent had filed for bankruptcy. SOF ¶ 144.

On December 11, 2014, Siena and LPT entered into a Loan and Security Agreement for the Siena Loan, which had an interest rate of prime rate plus 3 percent per annum. SOF ¶¶ 70, 72. The Siena Loan was secured by a first priority, perfected security interest and liens on all of LPT's and LPT Holdings' present and future assets and the outstanding stock and other equity interests issued by LPT and LPT Holding. SOF ¶ 71. No personal guarantees were required for the Siena Loan. SOF ¶ 73.

In connection with approving the Siena Loan, Siena evaluated the credit-worthiness of LPT and issued a Credit Line Approval on December 4, 2014. SOF ¶ 74. In the Credit Line Approval, Siena stated that LPT was "in the midst of a turnaround, with positive EBITDA not expected to be generated on a monthly basis until the beginning of 2015," and that "[w]ith $1.9MM of excess availability at close, LPT [would] have sufficient liquidity to cover the projected cash burn while it complete[d] the effectuation of the turnaround plan." SOF ¶ 75. Moreover, Siena reported that LPT's "A/P was mostly current" and that a "review of A/P and the accruals did not reveal any unusual items or that the Company [was] holding checks." SOF ¶ 86.

At his deposition, a Siena representative stated that Siena did not have serious concerns that it would not get repaid on its loan. SOF ¶ 76. He explained that Siena expected to be repaid either by "a sale of the business to a competitor looking to increase its market share or a larger paper manufacturer looking for diversification." SOF ¶ 76. Alternatively, if LPT could not be sold, the Siena representative testified

that Siena expected to be paid from the disposal of LPT's collateral. SOF ¶¶ 76, 142. In either event, Siena's "confidence that [their] exposure will be fully repaid" was based on collateral value, not on the cash flows generated by LPT's business. SOF ¶ 76; *see also* SOF ¶ 143 (noting that Siena's representative testified that "[t]he structure that we established as part of the underwriting had sufficient collateral coverage that we would be able to liquidate the assets securing the loan and can get paid in full"). At the same time, Siena did not believe that LPT was insolvent or unable to pay its debts as they came due. SOF ¶ 77. On December 11, 2014, Siena funded the Siena Loan. SOF ¶ 78.

### 2.    Post-Loan Financial Performance

LPT's actual EBITDA losses in 2014 exceeded $14.3 million before accounting for capital expenditures, SOF ¶ 99, and by early 2015, LPT was looking for more ways to address its cash shortage. At a March 11, 2015 Board meeting, Mr. Wissmann stated that he was seeking to free up the additional $1 million availability of the $6 million credit facility from Siena. SOF ¶ 145. According to Mr. Wissmann, Sienna suggested that it would require guaranties of shareholders for 150 percent of the additional availability and that at that point it was only willing to release $750,000 of the $1 million. SOF ¶ 145. The meeting discussion moved on to other options to create cash availability, including through the management of accounts receivable and accounts payable, and other operational approaches. SOF ¶ 145.

On the same day as the meeting, Mr. Mishkin and Sanabe's Daniel Zwelling sent a memorandum to Mr. Van Scotter and Mr. Wissmann detailing LPT's losses over the previous few months. SOF ¶ 146. The memorandum stated that LPT had

lost at least $3.0 million (EBITDA) between November 2014 and January 2015, and that the estimate was for a loss of $1.2 million (EBITDA) in February, of which $700,000 was related to the ongoing issues with the steam turbine. SOF ¶ 146. "Given this situation," the memorandum continued, "we cannot see how [LPT] can be characterized today as anything other than insolvent." SOF ¶ 146. At the subsequent Board meeting on March 16, Mr. Van Scotter introduced Bob Keach, "who would be advising the Board with respect to insolvency issues," and Mr. Keach opened the meeting with a discussion of the duties of the Board when LPT was in the zone of insolvency. SOF ¶ 148.

On March 31, 2015, LPT retained Spinglass Management Group LLC ("**Spinglass**") "for the purposes of assisting management in the compilation of financial projections and in the analysis of certain historical financial data." SOF ¶ 149. Two weeks later, Spinglass's Mark Stickney[19] reported to LPT that the "historical financial statements, on a monthly basis, have generated 17 consecutive months of negative EBITDA." SOF ¶ 150. He added that the "magnitude of the losses have weakened the balance sheet to the point that further losses post March 2015 cannot reasonably be funded," "[a]ccounts payable have been stretched to the limit," and "[v]endor pressure is mounting." SOF ¶ 150.

At an April 23, 2015 Board meeting, Mr. Wissmann informed the Board that LPT's auditor would be taking a going concern exception regarding the 2014 year-end audit and that the auditor had told management that it needed to perform a valuation

---

[19]     Mr. Stickney later became the liquidating trustee.

and write down of LPT's fixed assets to complete the audit. SOF ¶ 151. Mr. Wissmann explained that he did not consider it wise at that time to spend additional money for finalizing the audit, given the more pressing demands for LPT's funds. SOF ¶ 151.

By May of 2015, Mr. Wissmann reported that negative EBITDA and capital expenditures since the explosion had exceeded $51 million. SOF ¶ 152.

### F. LPT's Long-Term Debts and Other Potential Liabilities

CCP maintains that LPT had no long-term debt as of April 30, 2014, and as of the time of the May 2014 Distribution. SOF ¶¶ 57–58. Moreover, according to CCP, LPT paid, on average, 100 percent of accounts payable within 60 days of their due dates and 57 percent by the due date. SOF ¶ 79. CCP contends that the "earliest unpaid invoice for which a claim was filed in the Debtor's bankruptcy case was from August 2014 and all remaining unpaid invoices were from 2015. SOF ¶ 84. The Committee emphasizes that, although LPT had no long-term interest-bearing bank debt at those times, LPT still had a substantial liability owed to the Federal Energy Regulatory Commission ("**FERC**"), significant long-term pension liabilities, and a multi-year gas purchase agreement liability owed to Xpress Natural Gas ("**XNG**").[20] SOF ¶¶ 57–58. Each of these issues is discussed below.

---

[20]    CCP objects to the Committee's qualification that identifies these other liabilities, contending that it is "non-responsive and . . .  constitutes a Statement of Additional Material Fact." SOF ¶¶ 56–58 (CCP's Objection and Reply). If the Committee's qualification is treated as a new fact, CCP responds with a qualification, explaining:

> The 2013 Audited Financial Statements provide that (i) LPT was unable to predict the future requirements of its pension liabilities (ii) there was a dispute between the parties regarding LPT's purchase requirements and related payments under the gas purchase agreement with XNG, and (iii) the liability to FERC could not be reasonably estimated but management reserved $464,000 for the FERC matter. Moreover, LPT did not agree with the amounts of the pension and FERC liabilities.

### 1.     Long-Term Bank Debt

LPT had a Credit Agreement, dated June 30, 2010, with JP Morgan Chase Bank, N.A. ("**Chase**"), pursuant to which LPT executed a Term Loan Note in the amount of $36,000,000 for the benefit of Chase (the "**Term Note**"), and a Revolving Loan Note in the maximum amount of $10,000,000 for the benefit of Chase (the "**Revolving Note**," and together with the Term Note, the "**Chase Loan**"). SOF ¶ 51. Following the explosion of the Boiler, Chase declared a material adverse effect due to the explosion, terminated LPT's right to draw on the Revolving Note, and asserted an interest in the insurance proceeds. SOF ¶ 52. As of December 19, 2013, the principal and interest due to Chase on the Chase Loan was $14,954,633.21 on the Term Note and $5,212,893.38 on the Revolving Note, plus accrued and accruing interest, costs, and expenses. SOF ¶ 53. LPT paid off the Chase Loan on December 23, 2013. SOF ¶ 54. That same day, Mr. Wissmann told to the Board, "We are debt free." SOF ¶ 55. At that point, LPT had no long-term interest-bearing bank debt on its balance sheet. SOF ¶ 56.

### 2.     Federal Energy Regulatory Commission

Both before and after the Distributions, LPT was facing a potential liability to the Federal Energy Regulatory Commission ("**FERC**"). In a December 31, 2013 Planning Memo, Berry Dunn summarized the status of the FERC matter as follows:

> [FERC] assessed a $404k penalty on November 3, 2009 to reclaim unjust profits in accordance with ISO New England's Day-Ahead Load Response Program (DALRP) which pays industrial users of power for

---

SOF ¶¶ 56–58 (CCP's Objection and Reply) (citations omitted). I take these contentions to mean that LPT's balance sheets contained no long-term interest-bearing bank debt but that LPT had other possible liabilities of uncertain amounts.

designated levels of usage and for decreasing usage in the event the state-wide power grid needs additional power. In short, FERC has claimed that [LPT] fraudulently overstated its usage during the baseline measurement period and as a result, received approx. $404K of payments from FERC in violation of the DALRP agreement. [LPT] accrued for the $404K as well as a 15% potential penalty, for a total accrual of $465K. That accrual has remained on the books since then. In February 2011, Keith Van Scotter met with the FERC to discuss a possible resolution or settlement to the matter. The FERC discussed possible settlement figures in the $2-$5M range.

SOF ¶ 109. The Board acknowledged the potential FERC liability at the December 9, 2013 Board meeting, when Mr. Herring noted the risks with LPT remaining a going concern given the uncertainty of future operations, bank financing, and the FERC penalty. SOF ¶ 100. Likewise, a March 12, 2015 "snapshot" of LPT's potential liabilities included a reference to FERC. SOF ¶ 147. CCP emphasizes that the liability to FERC could not be reasonably estimated and that management could not agree with the amount of the FERC liability, but reiterates that management set aside $465,000 for the matter. SOF ¶ 56 (CCP's Objection and Reply). FERC ultimately filed a proof of claim in LPT's bankruptcy case in the amount of $5,379,016.03, which included a civil penalty and disgorgement. SOF ¶ 84 (Committee's Response).

### 3.   PACE Industry Union-Management Pension Fund

LPT participated in the PACE Industry Union-Management Pension Fund ("**PIUMPF**"), a union-sponsored multi-employer defined benefit pension plan. Record #4266 (ECF No. 196-16). According to Berry Dunn's audit report, LPT was required to contribute $1.19 per hour worked under its collective bargaining agreement, and recent years saw a surcharge applied to those contributions. Record #4267 (ECF No. 196-16). At the time of the audit, LPT could not predict future requirements or

contribution amounts. Record #4266–67 (ECF No. 196-16); SOF ¶ 56 (CCP's Objection and Reply). The Berry Dunn audit also noted that the risks of participating in PIUMPF included that, if LPT chose to stop participating, it might be on the hook for a "withdrawal liability" and be required to pay the plan an amount based on the underfunded status of the plan. Record #4266 (ECF No. 196-16). At the end of 2013, the PIUMPF's funded status was deemed "critical." Record #4266–67 (ECF No. 196-16).

In a June 2, 2014 letter, Maria F. Wieck of PIUMPF stated that LPT's "estimated net allocable share of unfunded vested benefits amounts to $22,950,434." SOF ¶ 122. Later that month, Mr. Van Scotter informed Duane Lugdon, the Staff Representative for the United Steelworkers Union, that "[t]he way it stands today, the enormous contingent liability associated with the pension shortfall is greater than the value of the business (by a lot)." SOF ¶ 123. Mr. Van Scotter added, "While we disagree with a number of things implicit in that, our ability to deal with it is limited unless we can get your help." SOF ¶ 123 (CCP's Response).

### 4.    Xpress Natural Gas

LPT had an agreement with Xpress Natural Gas ("**XNG**") for the delivery of natural gas by truck. Record #4268 (ECF No. 196-16). The agreement required LPT to submit an annual gas nomination specifying the quantity requested for each annual term ending on February 28. Record #4268 (ECF No. 196-16). Once XNG confirmed the amount, LPT was locked into purchasing the stated quantity and could face monetary penalties for a shortfall. Record #4268 (ECF No. 196-16). The Berry Dunn audit noted that there was a dispute between LPT and XNG regarding the

purchase requirement for the period ending February 28, 2014, with XNG claiming that LPT owed an additional amount and LPT asserting it was owed a refund. Record #4268–69 (ECF No. 196-16). The audit stated that the dispute was going to arbitration and "the likelihood of loss cannot be determined at this time." SOF ¶ 84 (Committee's Response); Record #4269 (ECF No. 196-16). XNG ultimately filed a proof of claim in the bankruptcy case in the amount of $2,013,507.07, which included a receivable claim for $369,195.28. SOF ¶ 84 (Committee's Response).

## III.  Procedural History

On September 28, 2015, LPT filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code. SOF ¶ 153. On December 9, 2015, LPT sold substantially all of its assets for $5.95 million, which was less than the amount of the outstanding secured debt. SOF ¶ 154. The unsecured claims filed against LPT in its Chapter 11 case totaled $122,957,224.20. SOF ¶ 155.

The Committee, which was appointed by the U.S. Trustee to act on its behalf, SOF ¶ 3, filed this adversary proceeding in the Bankruptcy case, and on February 15, 2018, I granted the motion to withdraw the reference. (ECF No. 1.) The Plaintiff filed a First Amended Complaint on October 22, 2018 (ECF No. 42) and a cleaned-up Second Amended Complaint ("**SAC**") (ECF No. 191) on July 28, 2020.

The Plaintiff asserts eleven causes of action, alleging that the Distributions should be avoided because each of the possible conditions under Maine and federal law—insolvency, unreasonably small capital, and payment of debts—are met. Each

count asserts a separate theory of recovery based on one of those conditions.[21] The Defendant has moved for summary judgment on four of those counts: the two claims under Maine and federal law pursuant to the Unreasonably Small Capital Test (Counts I and VI)[22] and the two claims under Maine and federal law pursuant to the Payment of Debts Test (Counts III and IX).[23]

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "it can be resolved in favor of either party," and a fact is "material" if "it has the potential of affecting the outcome of the case." *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020) (internal quotation marks omitted). The moving party bears the initial burden of showing that no such dispute exists, and the nonmoving party must then respond "with sufficient evidence to allow a reasonable jury to find in its favor with respect to each issue on

---

[21]    The Plaintiff also asserts that CCP entered into a General Release with LPT, LPT Holding, and other individuals, which purportedly included LPT's release of certain claims against CCP. SAC ¶ 56. CCP has not moved for summary judgment on any of the fraudulent transfer claims related to that release.

[22]    In the introductory paragraph and in other sections of its motion, CCP states that it is seeking summary judgment on Count IV. Def.'s Mot. Summary J. 1, 2, 6 n.3 (ECF No. 197). However, Count IV asserts a claim to avoid a separate action by the Debtor—an agreement in which the Debtor purportedly released claims against CCP and Mr. Meltzer—rather than the Distributions. SAC ¶¶ 82–89. From CCP's analysis and indication elsewhere that it seeks summary judgment on Count VI, I take the references to Count IV to be a typographical error.

[23]    The Defendant has stipulated to the first two elements of the Committee's claims under the Bankruptcy Code and the Maine Uniform Fraudulent Transfer Act, namely: (1) that the Distributions were transfers of an interest of LPT in property; and (2) that LPT received less than a reasonably equivalent value in exchange for such transfers.  SOF p. 49 n.8.

which it has the burden of proof." *Id.* (internal quotation marks omitted). " 'The role of summary judgment is to pierce the pleadings' and probe the proof to ascertain whether a need for trial exists." *Theriault v. Genesis HealthCare LLC*, 890 F.3d 342, 348 (1st Cir. 2018) (quoting *Kearney v. Town of Wareham*, 316 F.3d 18, 21 (1st Cir. 2002)).

In reviewing a motion for summary judgment, I must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Perry v. Roy*, 782 F.3d 73, 77 (1st Cir. 2015). But I am "not obliged either 'to draw unreasonable inferences or credit bald assertions [or] empty conclusions.' " *Theriault*, 890 F.3d at 348 (quoting *Cabán Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007)); *see also Barros-Villahermosa v. United States*, 642 F.3d 56, 58 (1st Cir. 2011) ("Mere allegations, or conjecture unsupported in the record, are insufficient." (internal quotations omitted)). Still, "summary judgment is improper when the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." *Morales-Melecio v. United States (Dep't of Health & Human Servs.)*, 890 F.3d 361, 368 (1st Cir. 2018) (internal quotation marks omitted).

## DISCUSSION

## I.   Unreasonably Small Capital Test

A plaintiff can prevail on a constructively fraudulent transfer claim if it proves that the debtor "was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an

unreasonably small capital." 11 U.S.C. § 548(a)(1)(B)(ii)(II). The slightly varied MUFTA standard permits avoidance of the transfer if the debtor was engaged or was about to engage in a business or transaction "for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction."[24] 14 M.R.S. § 3575(1)(B)(1).

Although neither the Bankruptcy Code nor MUFTA defines "unreasonably small" capital or assets, the term has been interpreted as "a general inability to generate enough cash flow to sustain operations." *In re Sheffield Steel Corp.*, 320 B.R. 423, 445 (Bankr. N.D. Okla. 2004) (internal quotations omitted); *see also In re Jackson*, 459 F.3d 117, 123–24 (1st Cir. 2006) (explaining court must "examine the ability of the debtor to generate enough cash from operations and sales of assets to pay its debts and remain financially stable after a transfer") (internal quotations omitted). The term connotes a financial condition less severe than insolvency but "which makes insolvency reasonably foreseeable." *In re Healthco Int'l, Inc.*, 208 B.R. 288, 302 (Bankr. D. Mass. 1997); *see also In re Oxford Homes, Inc.*, 180 B.R. 1, 11 (Bankr. D. Me. 1995) (citing *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992)). This is so "[b]ecause an inability to generate enough cash flow to sustain operations must precede an inability to pay obligations as they become due." *Moody*, 971 F.2d at 1070. Thus, this test is aimed at situations where the transfer left

---

[24]     In explaining the change from "unreasonably small capital," comment 4 of UFTA § 4 states that "capital" was "ambiguous" and notes that this "subparagraph focuses attention on whether the amount of all the assets retained by the debtor was inadequate, *i.e.*, unreasonably small, in light of the needs of the business or transaction in which the debtor was engaged or about to engage." UFTA § 4, comment 4.

the transferor "technically solvent but doomed to fail." *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995); *see also Healthco Int'l*, 208 B.R. at 302 ("[A] transaction leaves a company with unreasonably small capital when it creates an unreasonable risk of insolvency, not necessarily a likelihood of insolvency."); *SE Property Holdings, LLC v. Braswell*, 255 F. Supp. 3d 1187, 1206 (S.D. Ala. 2017) ("[T]his element may be satisfied even when the transferor is technically solvent.").

In analyzing the "unreasonably small" provision in UFTA,[25] the First Circuit explained that "unreasonably" is "clearly a relative term." *Barrett v. Continental Ill. Nat'l Bank & Trust Co.*, 882 F.2d 1, 4 (1st Cir. 1989) (adding that this language "demands . . . the sort of relative, contextual judgment which looks to both the ends served by [the statute] and the overall state of affairs surrounding the transferor corporation and the challenged transfer itself"). The "critical inquiry" is "one that weighs raw financial data against both the nature of the enterprise itself and the extent of the enterprise's need for capital during the period in question." *Id.* As part of this inquiry, courts consider "such factors as the company's debt to equity ratio, its historical capital cushion, and the need for working capital in the specific industry at issue." *MFS/Sun Life Trust*, 910 F. Supp. at 944; *see also* 5 Collier on Bankruptcy ¶ 548.05 ("The nature of the enterprise, normal turnover of inventory rate, method of

---

[25]     In *Barrett*, the First Circuit was analyzing a Massachusetts statute that adopted the prior version of UFTA, which still used the language "unreasonably small capital" rather than "unreasonably small assets." *See Barrett v. Continental Ill. Nat'l Bank & Trust Co.*, 882 F.2d 1, 2–3 (1st Cir. 1989).

payment by customers, etc, from the standpoint of what is normal and customary for other similar businesses in the industry, are all relevant factors in determining whether the amount of capital was unreasonably small at the time of, or immediately after, the transfer."). The company's access to financing and the length of time it survived following the transfer can also be relevant. *In re Lyondell, Co.*, 576 B.R. 107, 110–11 (Bankr. S.D. Tex. 2017); *see also In re Suburban Motor Freight, Inc.*, 124 B.R. 984, 999–1000 (Bankr. S.D. Ohio 1990) (in assessing whether debtor had unreasonably small capital, considering debtor's operating losses, inability to meet current financial obligations, deteriorating banking relationship, and market competition).

In this case, CCP points to several facts in the Record to support its position that LPT was adequately capitalized at the time of each Distribution. First, LPT was able to obtain two loans from third-party lenders several months after the May 2014 Distribution. Second, LPT Board members and management have testified that they believed that LPT was solvent and had sufficient cash on hand before and after each Distribution. SOF ¶¶ 46, 48. And third, LPT continued to operate for sixteen months after the second distribution, despite enduring an unprofitable year in 2014. SOF ¶ 18.

It is true that access to credit or financing can be relevant to assessing capitalization. *See In re SemCrude L.P.*, 648 Fed. Appx. 205, 209–10 (3d Cir. 2016) ("[I]n determining whether [debtor] was left with an unreasonably small capital following the equity distributions, the Bankruptcy Court properly considered the

availability of credit under [a credit agreement.]"). But in this case, there is no evidence in the Record that LPT had any existing credit agreements at the time of the Distributions. In fact, just before the December 2013 Distribution, both Mr. Herring and Mr. Wissmann expressed uncertainty about LPT's access to bank financing. SOF ¶ 100. Moreover, the loans that LPT ultimately obtained were from lenders that primarily served entities without access to traditional financing. *See* 10 M.R.S. § 1026-J; SOF ¶¶ 130, 139–40. And even then, LPT's approval was based largely on its collateral value, which suggests that LPT might have been able to repay the loans but might not have had enough capital or assets to sustain operations. *See In re Jackson*, 459 F.3d at 125–26 ("The sale of the majority of the subject parcels to pay debts and living expenses defeated the estate planning purpose . . . and indicates that the debtor was unable to generate enough cash from his own remaining assets to remain financially stable." (internal quotations omitted)).

In addition, the deposition testimony of LPT Board Members does not conclusively establish that LPT's remaining capital was reasonable. LPT faced several operational changes in late 2013 and into 2014. The destruction of the Boiler and decision not to repair it forced LPT to shift to tissue-only production, a course of action that one could reasonably conclude would increase LPT's operating costs and decrease EBITDA. *See* SOF ¶ 95 (Sanabe's statement in early 2013 that, if the pulp mill and the paper machines shut down and the tissue machines operated independently, the "tissue machines would struggle to survive"). At the December 2013 Board Meeting, both Mr. Herring and Mr. Wissmann shared concerns about the

uncertainty of future operations. SOF ¶ 100. As this shift was happening, LPT was also losing customers. SOF ¶¶ 102–03 (Hansen declared bankruptcy and LPT's sales to Hansen dropped from $6,128,469 in 2013 to $0 in 2014); SOF ¶¶ 104–07 (Oasis gave notice of termination of its tissue purchases in December of 2013). And soon after, LPT implemented a price increase that was forecasted to result in a loss of 1,966 tons of "measurable" monthly sales. SOF ¶ 113.

LPT's Board may have believed that LPT was in the midst of a "turnaround plan." *See* June 19, 2014 Board Meeting Minutes, Record #6035 (ECF No. 200-22) (stating that Mr. Wissmann and Mr. Van Scotter "briefed the Board on the status of the Company audit, liquidity issues and the possible need for securing working capital financing, and management's turnaround plan for business operations"); *see also* SOF ¶ 75 (Siena's Credit Line Approval described LPT as effectuating a "turnaround plan"). Members of the Board have testified that they believed that LPT was solvent and had sufficient cash on hand before and after each Distribution. SOF ¶¶ 46, 48. And at the time of the May 2014 Distribution, Mr. Wissmann explained that management had $7 million in net working capital that it believed could be used to secure a revolving credit facility to provide liquidity of approximately $5 million. SOF ¶ 121.

At the same time, CCP has not addressed the *relative* size of LPT's cash reserves, an inquiry that compares LPT's cash availability to its historical amount and to that of others in the industry. *See Barrett*, 882 F.2d at 4; 14 M.R.S. § 3575(1)(B)(1) (stating that the test considers whether "the remaining assets of the

34

debtor were unreasonably small in relation to the business or transaction"). The Record shows that LPT's capital was steadily falling through 2014. After the December 2013 Distribution, LPT had $31 million in working capital. SOF ¶¶ 39–40. By late April, LPT's working capital had fallen to $26.8 million, and after the May 2014 Distribution, it was $21.6 million. SOF ¶¶ 42, 44–45. LPT's balance of cash and temporary investments also dropped, from $15.3 million before the December 2013 Distribution, to $13.383 million on December 31, 2013, to $5.1 million on April 30, 2014, and finally to $3.1 million after the May 2014 Distribution. SOF ¶¶ 38, 39, 41, 44. In addition, at the May 1, 2014 Board Meeting, just over two weeks before the Board approved the $4 million distribution, Mr. Wissmann reported that LPT would likely need to tap into the $9.8 million of liquidity at the parent company and consume $4–5 million of that amount on capital and operating items that year. SOF ¶ 118, Record #6026. Thus, the capital LPT had after the Distributions appears smaller than its historical capital cushion. *See MFS/Sun Life Trust*, 910 F. Supp. at 944. And CCP has offered no evidence on what amount of capital was normal or customary for businesses in LPT's industry. *See id.*; *Fidelity Bond & Mortg. Co. v. Brand*, 371 B.R. 708, 728 (E.D. Pa. 2007) (stating that "[c]ourts evaluating the unreasonably small assets test compare the company to others in the industry" and noting that bankruptcy court credited trial testimony of defendants' expert on this topic); 5 Collier on Bankruptcy ¶ 548.05.

Finally, although LPT continued to operate the Mill until August of 2015, there were much earlier concerns about its ability to sustain operations. On December 9,

2013, Mr. Herring stated that there might be "significant risks with [LPT] remaining a going concern." SOF ¶ 100. At the same meeting that it approved the December 2013 Distribution, the Board discussed whether it made economic sense to continue to operate the Mill as a stand-alone mill. SOF ¶ 108. Just before the May 2014 Distribution was approved, the Board discussed the need to slow LPT's "cash burn rate." SOF ¶ 118. By March of 2015, Sanabe told LPT management that it could not see how LPT could "be characterized today as anything other than insolvent." SOF ¶ 146. And by May of that year, negative EBITDA and capital expenditures since the explosion exceeded $51 million. SOF ¶ 152. All of these facts could be relevant in determining if LPT "lack[ed] the ability to generate sufficient profits to sustain operations." *In re Opus East, LLC*, 698 Fed. Appx. 711, 715 (3d Cir. 2017).

The question of whether the Debtor's capital was unreasonably small after the distributions "is a factually-grounded one" based on foreseeability and relativity. *Barrett*, 882 F.2d at 4; *see also* 5 Collier on Bankruptcy ¶ 548.05 ("Whether the amount of property remaining in the hands of a person about to embark on a business transaction or a series of transactions is unreasonably inadequate is of course a question of fact in each case."). On this Record, I conclude that there are disputed facts about whether LPT was left with unreasonably small capital or assets after the Distributions. *See Sheffield Steel Corp.*, 320 B.R. at 446 (in denying summary judgment to defendant on issue of unreasonably small capital, explaining that the evidence was "mixed," adding that "[b]oth parties have submitted evidence of profits and losses, availability of credit, industry trends and projections over the periods in

question"). And making that assessment is the job for a jury. *See Frank Sawyer Trust of May 1992 v. C.I.R.*, 712 F.3d 597, 609 (1st Cir. 2013) (explaining that questions of "reasonableness" should typically "be decided after full evidentiary development by a finder of fact" (quoting *Baddin v. Olson* (*In re Olson*), 66 B.R. 687, 695 (Bankr. D. Minn. 1986)).

## II.     Payment of Debts Test

The Payment of Debts Test has been characterized as measuring "equitable insolvency," which is distinguishable from "insolvency in the 'bankruptcy sense,' (i.e. a deficit net worth immediately after the conveyance)." *See Moody*, 971 F.2d at 1063–64; *In re Oxford Homes, Inc.*, 180 B.R. 1, 11 (Bankr. D. Me. 1995).Under 11 U.S.C. § 548, the Committee can prevail on its fraudulent transfer claim if it proves that LPT "intended to incur, or believed that [it] would incur, debts that would be beyond [its] ability to pay as such debts matured." 11 U.S.C. § 548(a)(1)(B)(ii)(III). Although this language suggests a standard based on subjective intent, courts "have held that the intent requirement can be inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured." 5 Collier on Bankruptcy ¶ 548.05. Similarly, in addition to actual belief or intent, MUFTA explicitly permits recovery if the Committee establishes that LPT "reasonably should have believed" that it would incur debts beyond its ability to pay as they became due. 14 M.R.S. § 3575. Both statutes contemplate a "forward-looking" test that "requires assessing the debtor's reasonable prediction about its ability to repay a debt as it is incurred." *In re Opus East LLC*, 698 Fed. Appx. at 715; *In re Thunderdome Houston Ltd. P'ship*, No. 98 C

4615, 2000 WL 889846, at *10 (Bankr. N.D. Ill. June 23, 2000) (describing test as "forward-looking" under UFTA).

CCP asserts that the Committee cannot prevail on either its federal or state claim because "LPT intended to and did, in fact pay its debts as they came due at the time of each Distribution." Def.'s Mot. 8. CCP contends that there is no evidence in the Record suggesting that LPT made the Distributions with the requisite intent or belief, adding that every single member of the Board and senior management testified that he believed that LPT would be able to pay its debts as they came due after each of the Distributions. Def.'s Mot. 8–9. And CCP adds that LPT's actual payment of its debts defeats any claim based on an inference of LPT's intent or belief.

In response, the Committee brushes aside the testimony of LPT's officers and directors, emphasizing that the test under both Maine and federal law requires an assessment of "what would constitute objectively reasonable beliefs." Pl.'s Opp'n 15. In terms of the evidence that could support an inference of equitable insolvency, the Committee cites the Report of Craig T. Elson ("**Elson Report**"), which concluded that, based on the information known or knowable at the time of the Distributions, "LPT should have anticipated being unable to generate positive, debt-free, after-tax cash flows subsequent to the Explosion." Pl.'s Opp'n 16 (quoting Elson Report 51; D.E. 196-40, #4827–4828). In addition, the Committee points to facts about LPT's financial condition after the explosion, statements by LPT's officers, and minutes from Board meetings stretching from July of 2013 to June of 2014. Pl.'s Opp'n 9–10, 17–18.

This test poses a closer question than the Unreasonably Small Capital Test. Board Members have testified that they believed that LPT would continue to be able to pay its debts as they matured. SOF ¶¶ 87–88. And in reviewing LPT's loan application, Siena seems to have agreed. SOF ¶ 77. Moreover, courts have held that a debtor's actual payments of debts as they become due can doom a constructive fraud claim. *See In re Irving Tanning Co.*, 555 B.R. 70, 85 n.11 (Bankr. D. Me. 2016); *In re Joy Recovery Tech. Corp.*, 286 B.R. 54, 76 (Bankr. D. Ill. 2002) (collecting cases). LPT appears to have been up-to-date or nearly up-to-date with all of its accounts payable and had no outstanding long-term bank debt.

But the inquiry must focus on the facts and circumstances at the time of the Distributions, including what was reasonably believable about LPT's future.[26] Although LPT had no long-term bank debt at the time of the transfers, the Board was certainly aware of other possible liabilities, even if the exact amount to be owed was not yet clear. For example, the 2013 audited financial statements also recognized the potential liability owed to FERC. Berry Dunn Independent Auditor's Report ("**Berry Dunn Report**") 18–19, Record #4270–71 (ECF No. 196-16). Despite the uncertainty about the outcome of FERC's action and what LPT might owe, the financial statements noted that "[i]t is at least reasonably possible that a change in this estimate could occur in the near term and it could have a significant effect on the

---

[26]    I also note that it "is not easy to establish the intent of a party on a motion for summary judgment." *In re USA United Fleet, Inc.*, 559 B.R. 41, 81 (Bankr. E.D.N.Y 2016) (denying summary judgment to plaintiff in part because plaintiff failed to show that the undisputed facts established that the debtors intended or believed they would incur debts beyond ability to pay).

results of future operations." Berry Dunn Report 19, Record #4271; *see also* Berry Dunn Report 14–17, Record #4266–69 (discussing potential liabilities to PIUMPF and XNG).

Moreover, while it is true that "[a] balance sheet with significant equity, a loan commitment, and evidence of significant value and equity in the debtor all may indicate that the debtor . . . has the ability to repay its debts as they come due," these factors are both inconclusive and not established in the Record before me. *In re Parker*, No. 12–03128–8–SWH, 2015 WL 4747536, at *10 (Bankr. E.D.N.C. Aug. 10, 2015). As discussed above, whether LPT had "significant" equity—especially for the industry in which it operated—is unclear from the undisputed facts. Board Members expressed concerns about LPT's liquidity and future financing around the time of the December 2013 Distribution. SOF ¶ 100. By the May 2014 Distribution, the Board was aware of the need for additional capital, and Mr. Wissmann e-mailed the Board about LPT's projections for 2014 and 2015, stating that LPT would "require $4 million to fund losses and capital programs over this period." SOF ¶ 121. The following month, Mr. Van Scotter and Mr. Wissmann led the Board through a discussion of LPT's "liquidity issues." SOF ¶ 125. Throughout this period, LPT was facing declining sales and the loss of customers, with no evidence that it was able to secure new customers. These facts could support an inference that LPT reasonably should have believed that distributing millions of dollars would render it unable to pay debts as they matured. *See In re Suburban Motor Freight, Inc.*, 124 B.R. 984, 1001 (Bankr. S.D. Ohio 1990) (inferring intent to incur debts beyond ability to pay from "facts and

circumstances" in the record, including statements by directors and shareholders about the debtor's "cash flow problems" and references to debtor's "uncertain future viability").

Finally, although LPT was able to obtain a loan and credit facility later in 2014, there is no indication that LPT had access to such credit at the time of the Distributions. *See* Herring Dep. 68–71 (noting that LPT did not have access to credit facility at time of May 2014 Distribution); SOF ¶ 52 (after explosion and before December 2013 Distribution, Chase declared a material adverse effect, terminated LPT's right to draw on the Revolving Note, and asserted an interest in the insurance proceeds). When LPT did obtain financing, it was from lenders geared specifically towards at-risk businesses. *See* 10 M.R.S. § 1026-J; SOF ¶ 139; *see also In re Parker*, 2015 WL 4747536, at *11 (noting that debtor's ability to obtain a loan commitment might support finding that debtor was able to pay debts as they came due but explaining that "these facts are not conclusive" and adding that one of the loans was the type "afforded to individuals precisely because of a perceived likely inability to make payments"). And the FAME Loan indicated that LPT had an immediate need for the loan "to continue to make its supplier and other current obligations and payments." SOF ¶ 59. This suggests that, by the fall of 2014, LPT might have already needed outside funding to pay its debts.

At this stage, the undisputed facts do not establish that CCP is entitled to summary judgment.[27] Rather, the Record is filled with contrasting facts about LPT's

---

[27]     CCP contends that it is "not possible to infer an intent to render LPT unable to pay its debts as they came due from the surrounding facts and circumstances," and thus the Committee's argument

financial health. *See In re Brown Publishing Co.*, No. 10–73295–reg, 2015 WL 1009177, at *2 (Bankr. S.D.N.Y. Mar. 4, 2015) (holding that summary judgment was "not proper" on payment of debts or unreasonably small capital issues because parties presented "contrasting pictures of [debtor's] financial health" and relied on differing expert opinions); *see also Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014) ("Summary judgment is inappropriate if the evidence is sufficiently openended to permit a rational fact finder to resolve the issue in favor of either side." (internal quotations omitted)). Viewing the Record in the light most favorable to the nonmovant Committee, I conclude that a jury could infer that the Debtor, at the time of the Distributions, reasonably should have believed it would incur debts beyond its ability to repay.

## CONCLUSION

For the reasons stated above, the Court **DENIES** the Defendant's motion for partial summary judgment (ECF No. 197). The parties made some preliminary inquiries about whether the Court could accommodate a five- to six-day bench trial in December. Given the size of the legal teams involved in this case (four for the Plaintiff and five for the Defendant) and given the number of witnesses (between eight and thirteen), most of whom will be traveling from other parts of the country,

---

is "doom[ed]." Def.'s Mot. 10. But neither of the cases cited by CCP to support this position were decided at summary judgment. *See In re Irving Tanning Co.*, 555 B.R. 70, 73 (Bankr. D. Me. 2016) (concluding that plaintiff had not met burden after considering evidence at trial, "including the testimony of witnesses, the exhibits offered at trial, the various papers submitted by the parties, and the stipulations of the parties"); *In re EBC I, Inc.*, 380 B.R. 348, 355–59 (Bankr. D. Del. 2008) (recounting that the court previously concluded that there was a genuine issue of material fact on the question of debtor's financial condition and discussing expert testimony at trial).

it would not be prudent to conduct this trial in December. I am directing the Clerk to put this case on the first available civil jury trial list in Bangor.[28]


SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 30th day of October, 2020.

---

[28]      As their inquiries reflect, the parties also indicated that they may wish to waive their right to a jury trial. If they choose to do so, they should notify the Court.